THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH REED, Defendant-Appellant.

First District (1st Division) No. 1—96—3899

Opinion filed July 27, 1998.

Office of State Appellate Defender, of Chicago (Donna Finch, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Jessica R. Ball, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'BRIEN delivered the opinion of the court:

Following a bench trial, defendant, Keith Reed, was convicted of two counts of first-degree murder (720 ILCS 5/9—1(a)(1), (a)(2) (West 1996)) and sentenced to 60 years' imprisonment. On appeal, he contends: (1) he was denied his sixth amendment right to counsel when the trial court ordered his attorney to withdraw from the case; (2) his trial counsel provided ineffective assistance; (3) the trial court evidenced personal bias against him; (4) the State failed to prove him guilty beyond a reasonable doubt; (5) the trial court abused its discretion when sentencing him; (6) the cumulative effect of the errors denied him a fair trial; and (7) one of his two murder convictions should be vacated. We affirm defendant's conviction under section 9—1(a)(1) and vacate his conviction under section 9—1(a)(2).

At trial, Crystal Thomas testified she met defendant on May 23, 1992, and they became boyfriend and girlfriend. Crystal had a 21-month-old son, Kevin, by a previous relationship, and she and Kevin sometimes spent the night with defendant at his house on 5927 South Carpenter.

Crystal testified that in June 1992, her sister gave defendant's phone number to Kevin's father, who proceeded to call defendant's house on numerous occasions in order to speak with Crystal. Defendant apparently did not like Kevin's father calling Crystal, and after one such phone conversation between Kevin's father and Crystal, defendant threw some furniture and slammed a door.

On July 20, 1992, Kevin was playing in the bedroom of Crystal's mother's house. As he jumped up and down on the bed, Kevin tumbled over and hit his head on a window pane. Crystal applied some ice to Kevin's head, after which he resumed his play. Later that afternoon, Kevin hit his head on a glass table in Crystal's mother's living room.

Crystal applied some cold water to stop the bleeding, and Kevin again resumed his play.

Later that evening, Crystal and Kevin went to defendant's house, where they spent the next five days. On July 21 and July 22, 1992, Crystal noticed some new injures to Kevin, specifically, a discoloration of his eye and a little cut on the side of his lip. She asked defendant about the cause of Kevin's injuries, and defendant responded that the cut lip was from a "rug burn" and the discolored eye resulted from some bacteria or dust.

On July 24, 1992, Crystal and defendant had an argument concerning the frequent phone calls from Kevin's father. Defendant wanted the phone calls to stop, and he wanted to know whether Crystal intended to get back together with Kevin's father. During the argument, defendant knocked over some items that were sitting on the dining room table, punched and broke a fan, and swung a trophy around.

Later that evening, Crystal gave Kevin a bath. She did not notice any injuries to his chest or abdomen at that time. Kevin slept in defendant's room that night, while defendant and Crystal slept in the living room.

The following morning, July 25, 1992, Kevin woke up, walked into the living room, and sat down next to Crystal and defendant. Crystal testified that Kevin had no problem walking out from the bedroom.

Defendant then brought Kevin back into defendant's bedroom, where Kevin went back to sleep. Crystal took a bath and got ready to run some errands. Before leaving, she checked on Kevin, who was sleeping in only a diaper. Crystal did not notice any marks on Kevin's chest, nor did she notice anything wrong with him.

Crystal returned to the house around 3 p.m. and was met there by defendant's brother, who told her that Kevin was at Wyler's Children's Hospital. Crystal went to the hospital, where she was told that her baby was in surgery. A policeman then took her to 39th and California, where they questioned her and told her that Kevin was dead.

Officer Joseph Battaglia testified that at about 12:40 p.m. on July 25, 1992, he received a call about a possible child abuse victim at 5927 South Carpenter. He arrived at the house within two minutes of the call. After speaking with defendant's brother and another officer, Battaglia drove to Wyler's Children's Hospital, where he spoke with defendant about the child, Kevin.

Defendant explained to Officer Battaglia that Kevin was his girlfriend's (Crystal Thomas') child, and that Crystal and Kevin had been staying with him that week. Defendant told Officer Battaglia that Crystal went shopping that morning at about 9 a.m. and left

Kevin with defendant. While Crystal was out, Kevin began to "look sick," so defendant's brother called paramedics via 911. Officer Battaglia asked defendant whether he had ever seen Crystal harm Kevin in any fashion, and defendant responded negatively.

Detectives John McCann and Louis Caesar testified that around 2 p.m. on July 25, 1992, they received an assignment to proceed to Wyler's Children's Hospital regarding a seriously injured child, possibly the result of child abuse. At the hospital, the detectives spoke with Officer Battaglia and learned that Kevin was receiving medical treatment and that defendant was present in the hospital.

The detectives interviewed defendant in a police room in the hospital. Defendant told the detectives that around 9:30 a.m. on July 25, Crystal left his house, leaving defendant alone with Kevin. The baby was asleep when Crystal left.

Defendant further told the detectives that Kevin woke up around noon, and defendant went to change his diaper. At that time, defendant noticed that Kevin was having trouble walking. Defendant picked up Kevin, carried him to a rocking chair, and gave him a bottle. Defendant noticed that Kevin's eyes did not look right and that he appeared "spacey."

Defendant called his brother, who was a former medical technician. The brother came to the house, looked at Kevin, and told defendant that Kevin appeared to have problems with his abdomen and that his hands were white, cold, and clammy. The brother told defendant to call the paramedics. The paramedics arrived and took Kevin to the hospital.

Detectives McCann and Caesar testified they checked on Kevin after talking to defendant. The doctor showed them Kevin's body; he had been pronounced dead around 2:30 p.m. When viewing the body, Detective Caesar noticed swelling on the back of Kevin's head, a laceration of the lip, a dark eye, and bruises across his chest and abdomen.

Detectives McCann and Caesar testified they later took defendant to the police station at 39th and California, where they spoke with him in an interview room on the third floor. Defendant told the detectives that he had called the paramedics because Kevin "looked funny" when he woke up. Detective Caesar asked about the injuries to Kevin's lip and the back of his head, and defendant responded that Crystal had told him that Kevin hit his head on a table and while playing on a bed at her mother's house. Defendant stated he did not know how Kevin suffered the injuries that caused his death.

Detectives McCann and Caesar attended Kevin's autopsy on July 26, which was performed by Doctor Edmond Donoghue. Doctor Donoghue testified that he found extensive bruising on Kevin's head, chest,

abdomen, arms, and legs. There was also a large area of hemorrhage beneath the scalp on the right and left sides of the head. Doctor Donoghue found 14 internal injuries in the chest and abdominal cavity. Doctor Donoghue testified that Kevin died of multiple injuries due to blunt trauma and that the injuries were of the type seen in an automobile accident or in a child who had fallen out of a third-story window. Doctor Donoghue opined that Kevin's internal injuries happened only hours before his death.

Detectives McCann and Caesar testified they thereafter brought defendant back in for questioning. Around 6 p.m. on July 26, Detective Caesar spoke with defendant and asked if he knew how Kevin had been injured. Defendant told Detective Caesar that on July 25, 1992, when he brought Kevin from the front room to the bedroom, Kevin slipped out of his hand. Defendant caught Kevin on his forearm "kind of roughly"; defendant said that Kevin might have hurt his abdomen then. Defendant also told Detective Caesar that he played with Kevin later that morning by tossing him up in the air. Defendant opined that Kevin could have been injured then as well.

Defendant further told Detective Caesar that he had rearranged some furniture in his house on July 25. At one point, defendant retrieved a dolly from the basement in order to move the entertainment center. Kevin got behind him, so defendant slapped Kevin in the chest with the back of his right hand. Kevin fell into the couch and whimpered a little bit.

Defendant told Detective Caesar that he later noticed Kevin by a table, playing with some books and a prom mug. When Kevin grabbed the mug, defendant again backhanded him on the chest, causing Kevin to fall down. Defendant then picked Kevin up and placed him on a couch. Around noon, he prepared a bath for Kevin. However, when defendant tried to walk Kevin toward the bath, Kevin was unable to walk correctly; he kept falling down. Defendant then called his brother, who came over and said the baby did not look right. Specifically, defendant's brother stated that Kevin's abdomen looked abnormal, that he was pale, and that defendant should call the paramedics.

Detective Caesar testified that he asked defendant about the red marks on Kevin's chest. Defendant replied that he did not notice any marks on Kevin's chest until after he hit him.

Assistant State's Attorney Steven Rosenblum testified he spoke with defendant at about 8 p.m. on July 26 in an interview room on the third floor of the police station. Defendant told Rosenblum that Crystal had left him alone with Kevin on July 25. After Crystal left, defendant began rearranging some furniture in his living room. Kevin came into the living room, and defendant played with him by tossing him up in

the air and spinning him around a little bit. After he stopped playing with Kevin, defendant went back to moving the furniture. At one point, defendant got out a dolly and was moving the entertainment center. Kevin got in the way, so defendant hit Kevin hard in the chest area with the back of his hand in order to move him out of the way.

Defendant further told Rosenblum that he later saw Kevin playing with some prom glasses and a trophy that were on a table. Defendant did not want Kevin playing with those items, so again he hit Kevin hard in the chest with the back of his hand. Defendant then took Kevin into the bedroom, and Kevin fell asleep. About an hour later, when defendant tried to wake Kevin so he could take a bath, Kevin appeared sluggish and had a strange look on his face. Defendant called his brother, who came over, looked at Kevin, and told defendant that Kevin had some internal bleeding and cold, pale, clammy hands. Defendant called an ambulance for Kevin.

Defendant testified on his own behalf that he was home alone with Kevin on the morning of July 25, 1992. When Kevin awoke, defendant played with him by picking him up, swinging him around, and catching him. However, defendant soon noticed that Kevin did not appear to be feeling well, so defendant then left him alone and started moving some furniture. As defendant was moving his entertainment center toward a wall, he noticed that Kevin was behind him. To keep Kevin from being injured by the entertainment center, defendant pushed Kevin out of the way. Defendant testified he did not push him hard; rather, "it was more like a reflex, a real quick blow to get him out of the way." After defendant hit him, Kevin fell down, then got back up.

Defendant testified that he later noticed Kevin playing with a prom glass and a couple of trophies. Defendant took the prom glass and trophies away from Kevin, picked him up, and set him on a couch. Defendant gave Kevin some milk and cookies, and Kevin fell asleep on the couch. Defendant finished cleaning while Kevin slept.

Defendant woke Kevin so he could take a bath. Kevin took a couple of steps toward the bathroom, then fell down. Defendant picked Kevin up and noticed that he looked "spaced in the face." Defendant called his brother, who came over and said Kevin had internal bleeding. Defendant called an ambulance.

Defendant testified that he never intended to hurt Kevin at any time.

On cross-examination, defendant acknowledged an argument he had with Crystal after Kevin's father called defendant's house and threatened to shoot him. Defendant also testified that the night before Kevin's death, he and Crystal had a "disagreement" about their relationship.

Defendant testified that when he hit Kevin to push him out of the way of the entertainment center, Kevin scooted back and fell on his bottom, but did not hit the wall or couch. Defendant denied telling Detective Caesar or Assistant State's Attorney Rosenblum that he hit Kevin for playing with the prom glass. Defendant also denied seeing any red marks on Kevin's chest after he hit Kevin.

The trial court found defendant guilty of two counts of first-degree murder and sentenced him to 60 years' imprisonment. Defendant appeals.

First, defendant argues he was deprived of his sixth amendment right to counsel when the trial court ordered his attorney, Jack Rogdon, to withdraw from the case prior to trial. Defendant waived this issue by failing to raise it in his posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, even addressing the issue on its merits, we find no error.

The court's order came about as a result of a pretrial motion to suppress filed by Rogdon. In that motion to suppress, Rogdon stated that defendant had requested to speak with his attorney (Rogdon) when the detectives and assistant State's Attorney questioned him; that Rogdon was present at the police station during a portion of the interrogation; and that Rogdon was not permitted to see defendant. The State subsequently made an oral motion to disqualify Rogdon because he was a potential witness at the hearing on the motion to suppress. The State relied on Rule 5—102 of the Illinois Code of Professional Responsibility, which provided in relevant part:

> "If a lawyer learns after undertaking employment in contemplated or pending litigation or if it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial ***." 107 Ill. 2d R. 5—102.

Rogdon vigorously objected to the State's motion, arguing that his testimony would be unnecessary because there were other persons present at the police station who could verify the allegations in the motion. The trial court was skeptical of this argument, noting that Rogdon was the best witness to testify as to whether the police prevented him from speaking to defendant. The trial court also was wary of the possibility that, if it allowed Rogdon to stay on the case, he would question the defense witnesses at trial about whether the police had prevented defendant from speaking with him. The court thought this unacceptable, since Rogdon would be putting his "credibility at issue" and he could not be cross-examined. Accordingly, over Rogdon's objections, the trial court ordered him to withdraw from the case.

Before examining the propriety of the trial court's order, first we must determine the appropriate disciplinary rule governing Rogdon's conduct. The State argued that section 5—102 of the Illinois Code of Professional Responsibility (Code) necessitated his removal from the case. However, the Illinois Supreme Court repealed the Code in 1990 and replaced it with the Illinois Rules of Professional Conduct (Rules). See 134 Ill. 2d art. VIII. Thus, the Rules were in effect when the State moved for Rogdon's withdrawal, and accordingly our analysis begins with the Rules, as opposed to the Code.

■ Rule 3.7 is applicable here and states in relevant part:

"A lawyer shall not accept or continue employment in contemplated or pending litigation if the lawyer knows or reasonably should know that the lawyer may be called as a witness on behalf of the client ***." 134 Ill. 2d R. 3.7.

■ During argument on the motion to disqualify, the State argued that it might call Rogdon as a witness, since he was present at the police station at the time of defendant's interrogation and could testify as to whether the police officers refused to let him see defendant. Under such circumstances, Rule 3.7 mandated Rogdon's withdrawal, and in the face of his refusal to so withdraw, the trial court acted within its discretion when it ordered him off the case.

Defendant argues that we should not consider Rule 3.7's effect on this case, since said rule was not raised in the trial court. We reject this argument, as we may affirm on any basis in the record (*Monco v. Janus*, 222 Ill. App. 3d 280, 299 (1991)), and Rule 3.7 supports affirmance of the trial court's order.

■ Defendant also argues that the trial court should have held a hearing before ordering Rogdon to withdraw. In support, defendant cites *People v. Holmes*, 141 Ill. 2d 204 (1990), and *People v. Kubat*, 94 Ill. 2d 437 (1983). In *Holmes*, the State filed a pretrial motion to disqualify defendant's attorney because of a conflict of interest. *Holmes*, 141 Ill. 2d at 212-13. The trial court conducted a hearing on the motion, determined a conflict of interest existed, and removed the attorney from the case. *Holmes*, 141 Ill. 2d at 213. Our supreme court affirmed. In *Kubat*, the defendant filed a pretrial motion for change of counsel due to counsel's alleged ineffective assistance and a conflict of interest. *Kubat*, 94 Ill. 2d at 480-81. The trial court held two hearings, determined that defendant's allegations were substantially unsupported, and denied the motion. *Kubat*, 94 Ill. 2d at 481. Our supreme court affirmed.

Although the trial court in *Holmes* and *Kubat* conducted hearings before determining whether to disqualify counsel, neither case held that such hearings are mandatory where, as here, the pleadings on file

clearly indicate that counsel is a potential witness on behalf of his client. Further, the trial court here did not simply rely on the pleadings; it also heard argument from both the State and defense regarding Rogdon's potential appearance as a witness prior to making its ruling. Said argument, along with the motion to suppress filed by Rogdon, convinced the court that Rogdon must withdraw. As discussed above, we find no abuse of discretion in the court's determination.

■ Next, defendant argues that the trial counsel who replaced Rogdon provided ineffective assistance during the hearing on his motion to suppress, at trial, and at sentencing. The State notes that defendant did not raise this issue in his posttrial motion. However, defendant does not waive his ineffective assistance of counsel claim by failing to raise it in a posttrial motion where, as here, the posttrial motion was prepared and presented by the same attorney who represented defendant at trial. *People v. Keener*, 275 Ill. App. 3d 1, 5 (1995). Therefore, we address the issue on its merits.

■ To establish a claim of ineffective assistance, defendant must show that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced defendant. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). To establish that counsel was ineffective, defendant must overcome the strong presumption that the challenged conduct falls within the realm of trial strategy. *People v. Randle*, 277 Ill. App. 3d 788, 797 (1995).

First, we address counsel's performance during the hearing on the motion to suppress. Counsel presented two witnesses at the hearing: defendant and his brother, Wilson. Wilson testified that, in July 1992, he was living with defendant at 5927 South Carpenter. On July 25, 1992, defendant's girlfriend's son, Kevin, became sick. They called an ambulance, which transported Kevin to Wyler's Children's Hospital. Defendant accompanied Kevin to the hospital, and Wilson went to the hospital later that day to be with defendant.

Wilson testified that while in the hospital emergency room around 1 p.m., he spoke with Detective McCann and asked him if defendant was under arrest and needed an attorney. Detective McCann said "no."

About 15 or 20 minutes later, Wilson spoke with Detective Caesar in the hospital parking lot. Defendant was present during this conversation. Following the conversation, defendant accompanied Detectives McCann and Caesar to the police station.

Wilson testified he went to the police station and talked with Detective McCann at around 3 or 4 p.m. Wilson asked Detective Mc-

Cann whether defendant was under arrest and needed an attorney. Detective McCann stated that defendant was not under arrest and did not need an attorney. However, Detective McCann would not let Wilson see defendant.

Wilson testified he next saw defendant in the late evening on July 25, in the police station parking lot. Defendant was with Detectives McCann and Caesar, and the three of them were about to go to another facility so that defendant could take a polygraph test. Defendant was not handcuffed. Wilson asked to go with defendant, but the detectives refused. Defendant returned home around 10 p.m.

Wilson testified that Detectives McCann and Caesar came to his house around 11 a.m. on Sunday, July 26. Detective McCann told Wilson that they wanted to ask defendant a couple of more questions so that they could wrap up the investigation. Detective McCann also stated that defendant was not under arrest and did not need an attorney. Defendant then left the house with the detectives.

Defendant testified on his own behalf that after he arrived at the hospital on July 25, uniformed police officers directed him to move into a police room. While in that room, defendant spoke with Detectives McCann and Caesar about Kevin. Defendant testified that he voluntarily spoke with Detectives Caesar and McCann while in the hospital and that they did not give him *Miranda* warnings at that time.

Defendant testified he then voluntarily left the hospital and went with the detectives in their car to the police station. Defendant was not handcuffed, and the detectives did not give him *Miranda* warnings in the squad car or after they arrived at the police station. At the station, the detectives questioned defendant about the circumstances surrounding Kevin's death.

Defendant testified that the detectives asked him if he would take a polygraph test. Defendant said "yes." Defendant left the police station around 5 p.m. with the detectives and Crystal Thomas in an unmarked police car. Defendant was not handcuffed or given *Miranda* warnings. They proceeded to 11th and State, where defendant and Crystal took a polygraph examination. Defendant testified that before taking the polygraph test, he signed a consent form containing his *Miranda* rights.

The detectives then transported defendant back to the police station at 39th and California. After one of the detectives retrieved a camera, they all proceeded to Crystal's house. Defendant was not handcuffed. The detectives then dropped defendant off at his home.

Defendant testified that the detectives arrived at his house the next day, July 26, at around 1 p.m. The detectives told defendant that

they had a few more questions for him, and they asked him to come to the police station. Defendant testified he voluntarily accompanied the detectives to the police station and that he was not handcuffed.

Defendant testified he spoke with Assistant State's Attorney Rosenblum, who advised him of his *Miranda* rights. Defendant testified he told Rosenblum that he was at the police station voluntarily.

The court then questioned defendant, asking him whether he had at all times voluntarily accompanied the detectives to the police station. Defendant said "yes."

Following defendant's testimony, defense counsel argued that since the detectives failed to give defendant his *Miranda* warnings at the hospital or when they took him to the police station on July 25, the court should suppress any statements he made that day.

The trial court denied the motion to suppress, finding that defendant voluntarily went to the police station on July 25 and, therefore, the officers had no duty to give defendant *Miranda* warnings.

■ On appeal, defendant argues his counsel was ineffective for failing to elicit testimony that the police had denied defendant's request to have an attorney present during questioning. We find no ineffective assistance, as defendant has failed to overcome the strong presumption that counsel's conduct was the result of trial strategy; presumably, after interviewing the defendant and other witnesses, counsel determined that defendant did not invoke his right to counsel during any of the interrogation sessions. Accordingly, counsel provided reasonable professional assistance by proceeding on the theory that the detectives failed to give defendant *Miranda* warnings.

Defendant also argues that his counsel was ineffective for failing to file a motion to quash his arrest at the hospital on July 25, based on a lack of probable cause. To prevail on his claim, defendant must show that the trial court would have granted the motion. *People v. Bennett*, 222 Ill. App. 3d 188, 201 (1991).

■ An arrest occurs when a person's freedom of movement has been restrained by means of physical force or show of authority. *In re J.W.*, 274 Ill. App. 3d 951, 957-58 (1995). In determining whether a person has been arrested, the relevant inquiry is whether a reasonable, innocent person in his situation would conclude that he was not free to leave. *J.W.*, 274 Ill. App. 3d at 958. Factors to be considered in determining whether an arrest occurred include the presence or absence of a formal declaration of arrest and other routine procedures associated with an arrest, such as handcuffing and fingerprinting. *People v. McClellan*, 232 Ill. App. 3d 990, 999 (1992).

■ The testimony at the motion to suppress established that defendant voluntarily spoke with Detectives McCann and Caesar at the

hospital and at the police station on July 25 and voluntarily accompanied them to the police station at 39th and California, to 11th and State, and to Crystal's home. The detectives never handcuffed defendant and returned him home on the night of July 25. These facts were sufficient to show that the detectives did not arrest defendant on July 25. It follows, then, that the trial court would have denied a motion to quash arrest and, thus, counsel was not ineffective for failing to file said motion. *Bennett*, 222 Ill. App. 3d at 201.

■ Defendant next argues his counsel was ineffective for not attempting to have his inculpatory statements given on July 26 suppressed. We disagree, as trial counsel reasonably could have concluded that no viable theory existed for suppressing the July 26 statements. First, defendant testified he voluntarily accompanied the detectives to the police station on July 26. Second, Detective McCann, Detective Caesar, and Assistant State's Attorney Rosenblum testified they all advised defendant of his *Miranda* rights on July 26. Third, no evidence was presented that the detectives in any way coerced defendant into making his statements. Accordingly, counsel made a reasonable decision not to argue for the suppression of the July 26 statements.

Defendant argues his counsel was ineffective for failing to file any motions other than a motion to suppress, an answer to discovery, and a motion for new trial. We reject defendant's argument, as he fails to set forth with any specificity the other motions counsel should have filed to effect a change in the outcome of his case.

Next, we address defendant's allegations of ineffective assistance immediately prior to and during trial. First, defendant argues counsel was ineffective for failing to review the police reports prior to trial. In support, defendant cites to a colloquy that occurred after Officer Battaglia testified he spoke with defendant at the hospital on July 25. When the prosecutor asked Battaglia if defendant told him what happened earlier that day, counsel objected, arguing that Battaglia had not given defendant *Miranda* warnings before questioning him. The trial court asked counsel why he had not filed a motion to suppress defendant's statements to Battaglia, and counsel responded that this was the first he had heard of such statements. The assistant State's Attorney responded that defendant's statement to Officer Battaglia was contained in the "very first police report counsel ever received in this case." Counsel subsequently looked at the police report in question and conceded that it contained defendant's statement to Officer Battaglia. The trial court allowed Officer Battaglia to testify about defendant's statement to him.

■ Counsel's failure to read the police report containing defendant's statement to Officer Battaglia does not constitute ineffec-

tive assistance, because defendant was not prejudiced thereby. As recounted earlier in this opinion, defendant's statement to Officer Battaglia was not incriminating; Battaglia testified that defendant merely told him Kevin had begun to "look sick" and that paramedics were called. Thus, since defendant's statement to Officer Battaglia did not implicate him in Kevin's death, counsel's failure to learn of the statement prior to trial and have it suppressed did not constitute ineffective assistance. See *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991) (court may dispose of an ineffective assistance claim on the ground of lack of sufficient prejudice without reaching the deficiency analysis).

Defendant argues that since counsel did not read the police report containing defendant's statement to Officer Battaglia, he probably did not read the other police reports in this case and, thus, was ineffective. We disagree, as counsel indicated on the record that he had reviewed the other police reports in this case and was familiar with their contents, and defendant points to no evidence to the contrary.

■ Defendant next contends his trial counsel provided ineffective assistance by failing to adequately cross-examine Crystal Thomas about the older injuries found on Kevin's body. In other words, defendant contends that counsel should have attempted to establish that Crystal, not defendant, abused Kevin. However, our review of the record indicates that counsel did question Crystal about prior injuries received by Kevin. Further, counsel elicited from Crystal an admission that she had previously left Kevin in defendant's care and that she had never seen defendant hit Kevin. Thus, counsel did attempt to establish that someone other than defendant had hurt Kevin, and therefore we find that counsel's cross-examination of Crystal satisfies an objective standard of reasonableness.

Defendant argues that counsel should have impeached Crystal with her grand jury testimony in which she stated that the only injuries Kevin had prior to arriving at defendant's home were "two small bumps." We do not follow defendant's logic. At trial, Crystal testified that, prior to arriving at defendant's home, Kevin bumped his head twice at Crystal's mother's house. Thus, Crystal's trial testimony was *consistent* with her grand jury testimony. No cause for impeachment existed.

■ Next, defendant argues his counsel was ineffective for failing to object to Doctor Donoghue's testimony that wounds on Kevin's left arm were indicative of a bite mark. We disagree. Given the evidence presented at trial, there is no indication that the outcome of the trial would have been different had counsel objected to the testimony.

Defendant also asserts that his counsel's cross-examination of Doctor Donoghue was "totally inane," because the cross-examination

comprised only three pages of the record. However, effective advocacy cannot be measured by the number of pages of cross-examination. *People v. Williams*, 139 Ill. 2d 1, 19 (1990). Defendant further faults counsel for asking no "legitimate questions" during the cross-examination and for failing to question Doctor Donoghue about the evidence of prior physical abuse of Kevin. Our review of the record indicates that counsel elicited testimony from Doctor Donoghue that many of Kevin's injuries were more than three months old; said testimony bolstered counsel's attempt to show that someone other than defendant may have abused Kevin in the past and perhaps caused his death. Accordingly, we find counsel's cross-examination of Doctor Donoghue satisfied an objective standard of reasonableness.

Next, defendant argues his counsel was ineffective for conceding during closing argument that defendant was guilty of involuntary manslaughter. In support, defendant relies on *People v. Hattery*, 109 Ill. 2d 449 (1985). In *Hattery*, defendant pleaded not guilty to murder charges. *Hattery*, 109 Ill. 2d at 458. However, at trial, his counsel admitted defendant's guilt in opening statements, advanced no theory of defense, and presented no evidence or closing argument. *Hattery*, 109 Ill. 2d at 458-59. Instead, counsel attempted to preclude imposition of the death penalty by developing on cross-examination that defendant was compelled to kill the victim. *Hattery*, 109 Ill. 2d at 459. Our supreme court held that counsel's trial strategy was "totally at odds" with defendant's plea of not guilty and that there was no evidence defendant consented to his counsel's strategy. *Hattery*, 109 Ill. 2d at 464. The court further held that "[c]ounsel may not concede his client's guilt in the hope of obtaining a more lenient sentence where a plea of not guilty has been entered, unless the record adequately shows that defendant knowingly and intelligently consented to his counsel's strategy." *Hattery*, 109 Ill. 2d at 465. The court found that counsel's actions presented an exceptional circumstance in which prejudice to his client is presumed, and the two-part *Strickland* test need not be applied. *Hattery*, 109 Ill. 2d at 461-65.

However, in *People v. Johnson*, 128 Ill. 2d 253 (1989), the supreme court narrowed *Hattery*, holding that defense counsel's concession of guilt is not *per se* ineffective assistance such that the *Strickland* test may be forsaken. Rather, defendant can establish *per se* ineffectiveness only if he shows that defense counsel "entirely failed to subject the prosecution's case to meaningful adversarial testing." *Johnson*, 128 Ill. 2d at 270; see also *People v. Combs*, 206 Ill. App. 3d 217, 223 (1990); *People v. Campos*, 227 Ill. App. 3d 434, 447 (1992). If defendant fails to do so, he must satisfy the *Strickland* test by proving that counsel's deficiencies were objectively unreasonable and prejudicial to him. *Campos*, 227 Ill. App. 3d at 447.

■ In the present case, the evidence was overwhelming that Kevin died as a result of injuries inflicted only hours before his death, when he was alone with defendant. Defendant also confessed to hitting Kevin on the morning of his death. Faced with this evidence, counsel made a reasonable decision to concede defendant's guilt to a lesser offense, involuntary manslaughter, in an attempt to gain a shorter sentence. In support of the involuntary manslaughter defense, counsel elicited testimony from defendant that he hit Kevin in order to move him out of the way of some furniture and that he meant Kevin no harm. Defendant also elicited testimony from Crystal that she had never seen defendant intentionally harm her child. Further, defendant vigorously cross-examined prosecution witnesses, voiced appropriate objections, and probed the State's case for weaknesses. Thus, defendant has not shown that counsel failed to subject the prosecution's case to meaningful adversarial testing; to the contrary, the record indicates that counsel provided defendant with objectively reasonable representation. Accordingly, we find no ineffective assistance.

■ Defendant also argues that counsel had "no theory of defense." We disagree. As discussed above, counsel first tried to establish that someone other than defendant may have been responsible for Kevin's death, and when the overwhelming evidence indicated otherwise, counsel opted to argue for involuntary manslaughter. Counsel's performance was objectively reasonable.

Next, we review defendant's allegations of ineffective assistance of counsel during sentencing. First, defendant claims counsel was ineffective for failing to advise his co-counsel that the State was seeking the death penalty for defendant. We find no ineffective assistance, as the court did not impose the death penalty in this case, and therefore defendant suffered no prejudice from defense counsel's conduct.

Next, defendant argues his counsel was ineffective for failing to present mitigating evidence at sentencing. However, our supreme court has held that "[m]itigating evidence can be double-edged, and trial counsel may feel that the risks in presenting potentially mitigating evidence are too high. *** [T]his court should defer to the trial counsel's decision unless there is proof that he failed to present mitigating evidence due to his failure to properly investigate and prepare the defense." *People v. Steidl*, 142 Ill. 2d 204, 249 (1991). Nothing in the record indicates counsel here failed to properly investigate potential mitigating evidence.

Further, even assuming counsel was deficient in failing to present mitigating evidence, defendant cannot show that he suffered prejudice as a result, since most of the mitigation evidence was contained in the presentence report read by the judge. See *People v. Griffin*, 178 Ill. 2d 65, 87 (1997).

Defendant's final claim of ineffective assistance concerns his counsel's failure to file a motion to reconsider his sentence. We find no ineffective assistance, as nothing in the record indicates such a motion would have succeeded. See our discussion of defendant's sentencing, *infra*.

■■■ Next, defendant argues we should reverse his conviction because the trial court evidenced personal bias against him. Although defendant failed to raise this issue in his posttrial motion, application of the waiver rule is less rigid where the basis for the objection is the conduct of the trial judge. *People v. Nevitt*, 135 Ill. 2d 423, 455 (1990). Therefore, we consider the issue on its merits.

The right of a defendant to an unbiased trier of fact "is rooted in the constitutional guaranty of due process of law and entitles a defendant to a fair and impartial trial before a court which proceeds, not arbitrarily or capriciously, but upon inquiry, and renders judgment only after trial." *People v. Phuong*, 287 Ill. App. 3d 988, 993 (1997), quoting *People v. Eckert*, 194 Ill. App. 3d 667, 673 (1990). Accordingly, when a judge displays bias against defendant, reversal is required. *Phuong*, 287 Ill. App. 3d at 993.

Defendant contends the trial court evidenced its bias when it made the following comment while finding him guilty:

"A brutal vicious beating is what occurred here and that's all. That is all that occurred here. The doctor said this child suffered multiple repetitive blows to his abdomen and chest. This child's heart was torn. This child's liver was torn. This child's rectum was torn. Everything inside of this child that could be torn was torn by this defendant's brutal beating. It was a brutal, vicious, malicious, animalistic kind of behavior from a grown man to a helpless child."

The judge's comments accurately reflected the evidence presented at trial rather than any preconceived notions or bias toward defendant. We find no error.

Defendant also complains of a subsequent comment made by the judge to defendant's mother, who was in the courtroom:

"I mean this is just for the mother of the defendant who was in court because she did not hear the doctor's testimony. This young man beat this child to the point where the doctor said it was comparable to the child being thrown out of a third floor window or being involved in the [*sic*] car accident. He beat the hell out of this child."

These comments do not reflect bias or prejudice toward defendant. Rather, they were made in an attempt by the trial judge to explain her ruling to defendant's mother, who apparently was not present during the medical examiner's testimony. We find no error.

Next, defendant argues the State failed to prove he acted with any of the mental states specified in the murder statute. Defendant argues the evidence showed he acted recklessly and asks us to reduce his conviction to involuntary manslaughter.

■ When considering a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

■ Defendant here was charged with the forms of murder defined in sections 9—1(a)(1) and (a)(2) of the Criminal Code of 1961 (Code) (720 ILCS 5/9—1(a)(1), (a)(2) (West 1996)). The statute states:

> "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>> (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
>> (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9—1(a)(1), (a)(2) (West 1996).

Defendant argues that the evidence failed to establish that he intended to kill or cause Kevin great bodily harm, or that he knew his acts would cause death or would create a strong probability of death or great bodily harm to Kevin. We disagree.

The requisite mental state may be inferred from defendant's conduct and the circumstances surrounding his commission of the crime. *People v. Tye*, 141 Ill. 2d 1, 15 (1990). "Disparity in size and strength between the defendant and the victim and the nature and extent of the victim's injuries are relevant circumstances in ascertaining whether the defendant possessed the necessary mental state." *Tye*, 141 Ill. 2d at 15-16.

Here, defendant was an 18-year-old male, about 6 feet tall and 180 pounds. The victim, Kevin, was a 23-month-old baby, 33.4 inches in length and weighing 28.4 pounds. The evidence established that Kevin died of multiple injuries due to blunt trauma, and the injuries were of a type seen in an automobile accident or in a child who had fallen out of a third-story window. Given the disparity in size between defendant and Kevin, the extent of Kevin's injuries and the force needed to cause them, we conclude that the trial judge could infer that defendant acted with the necessary mental state to support a conviction for first-degree murder.

We also note that the evidence established that the injuries were

inflicted at a time when Kevin was home alone with defendant. Further, defendant admitted striking Kevin. Taking the evidence in the light most favorable to the prosecution, any rational trier of fact could find defendant guilty of murder beyond a reasonable doubt.

Next, defendant argues the trial court abused its discretion during sentencing when it relied on a fact not supported by the evidence, specifically, that defendant administered karate chops to Kevin. Defendant asks us to vacate his 60-year sentence and remand for a new sentencing hearing.

■ Defendant waived this issue by failing to file a postsentencing motion. *People v. Reed*, 177 Ill. 2d 389 (1997). However, even addressing the issue on its merits, we find no cause to disturb the sentence imposed by the trial judge.

When we can determine from the record that the reliance on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required. *People v. Bourke*, 96 Ill. 2d 327, 332 (1983). Here, the trial judge did wrongly state that the evidence showed defendant karate chopped Kevin. However, the record indicates that the weight placed on the wrongly considered factor did not result in a greater sentence. Rather, the trial judge gave defendant a 60-year sentence based on the "tremendous force [used] to beat this child to death," the "brutality involved in this case," and defendant's lack of remorse. Said considerations were amply supported in the trial record. We find no abuse of discretion.

■ Next, defendant argues the "cumulative effect" of the errors denied him a fair trial. We reject this argument, as defendant is rearguing the same alleged errors that we have already found do not necessitate a new trial. See *People v. Adams*, 283 Ill. App. 3d 520, 527 (1996).

■ Finally, we address defendant's argument that we must vacate one of his murder convictions. Defendant was charged with and convicted of murder under sections 9—1(a)(1) and (a)(2) of the Code. 720 ILCS 5/9—1(a)(1), (a)(2) (West 1996). However, defendant cannot be convicted of more than one murder arising out of the same physical act. *People v. Pitsonbarger*, 142 Ill. 2d 353, 377 (1990). When multiple murder convictions have been entered for the same act, the less culpable conviction must be vacated. *People v. Oaks*, 169 Ill. 2d 409, 471 (1996). A murder conviction under section 9—1(a)(2) involves a less culpable mental state than a conviction under section 9—1(a)(1). See *Pitsonbarger*, 142 Ill. 2d at 378. Therefore, we affirm defendant's conviction under section 9—1(a)(1) and vacate defendant's conviction under section 9—1(a)(2).

For the foregoing reasons, we affirm defendant's conviction under section 9—1(a)(1) and vacate his conviction under section 9—1(a)(2).

Affirmed in part and vacated in part.

BUCKLEY, P.J., and GALLAGHER, J., concur.