Filed 6/13/08          NO. 4-07-0288

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| JEREMY I. CALHOUN, | ) | No. 05CF1277 |
| Defendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | Robert J. Eggers, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE APPLETON delivered the opinion of the court:

The State charged defendant, Jeremy I. Calhoun, with aggravated battery of a child (720 ILCS 5/12-4.3(a) (West 2004)). The child, defendant's two-month-old son, was taken to the hospital. After medical examinations were performed on the child, the hospital personnel discovered old and new hemorrhages on the child's brain, suspected he was the victim of shaken-baby syndrome, and contacted the police. Police officers responded to the hospital where they met with defendant. The officers took defendant to the police station for an interview, stopping at defendant's residence to familiarize themselves with the conditions of the home.

At the police station, defendant initially provided several possible explanations of how the child was injured, none of which included him shaking the child. Later during the interview, defendant admitted he had shaken the child "a little." Following defendant's admission, the interviewing officer gave defendant Miranda warnings. See Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). The officer told defendant the questioning had progressed from an "interview" to an "interroga-

tion."  Defendant again admitted that he was responsible for the child's injuries, and he explained how those injuries were inflicted.  He also admitted that he had shaken the child on at least one prior occasion.  On defendant's motion, the trial court suppressed the post-Miranda statements.  The State appeals, and we reverse.

### I. BACKGROUND

Rick Dhabalt, a detective with the Springfield police department, testified to the following facts.  On September 24, 2005, he responded to St. John's Hospital for a "shaken baby" call.  There, he met with defendant, the baby's father.  He spoke with defendant for approximately 10 minutes at the hospital, and then they proceeded to the police station for an interview.  Detective Dhabalt wanted to interview those at the hospital, including defendant; Amber, the baby's mother; and Mark Calhoun, the baby's paternal grandfather.  He interviewed defendant first only because defendant said he had to go to work later that evening.  According to Dhabalt, defendant was not considered a suspect.  Defendant rode in the front passenger seat of Dhabalt's police car to the police station.  On the way, they stopped at defendant's residence because Dhabalt said he wanted to "take a look at the house" before interviewing witnesses.  Defendant voluntarily led Dhabalt through the residence, a duplex where he, Amber, and the child resided.  Mark lived next door in the adjoining unit.

After leaving the residence, the two proceeded into an interview at the police station.  Defendant was not handcuffed, was not under arrest, and had not been issued Miranda warnings.  Detective Jeremy T. Wooldridge joined them in the interview room.  A recording and a transcript of the interview were made and admitted into evidence.  The interview began at 7:18 p.m. and ended at 7:50 p.m.  Approximately 15 to

- 2 -

20 minutes into the interview, Detective Dhabalt said he asked defendant if he shook the baby and defendant responded: "A little." Dhabalt testified:

"I started to say a couple of things, but [defendant] kept interrupting me and asking me some questions in reference to what was going to happen *** but I made several attempts, and I finally had to stop him and tell him the process that we were going through, that the nature of the interview had changed and that I had to read him his <u>Miranda</u> warnings."

Dhabalt said that after he advised defendant of his <u>Miranda</u> rights, defendant continued speaking about "the nature of this case." Dhabalt said defendant told him he had shaken the baby once or twice before but he could not remember when. Defendant was arrested and taken to jail.

Detective Wooldridge also testified at the hearing and corroborated Detective Dhabalt's testimony with regard to defendant's interview.

The trial court indicated that it had watched the digital video disc (DVD) recording of the interview sometime before the hearing. The court also reviewed the transcript of the interview. Because the State claims the court's "apparent recall of the interview was clearly inaccurate, and the trial court erred by relying on defense counsel's disingenuous characterization of the interview," we viewed the DVD and reviewed the transcript of defendant's interview. According to the transcript, Detective Dhabalt repeatedly asked defendant if he understood his <u>Miranda</u> rights as they were being read to him. Because defendant never verbally acknowledged that he understood his rights,

- 3 -

the transcript fails to indicate any affirmation to that effect.

Our review of the DVD indicates that although defendant did not <u>say</u> he understood, he nodded affirmatively each time that Detective Dhabalt asked him if he understood. The following is the relevant excerpt from the recorded interview:

"DHABALT: You have the right to remain silent. Do you understand that? [Defendant nodded.] Anything you say can and will be used against you in a court of law. Do you understand that? [Defendant nodded.] You have a right to talk to a lawyer and have him present with you while you are being questioned. Do you understand that? [Defendant nodded.] If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. Do you understand that? [Defendant nodded.] You can decide at any time to exercise these rights and not answer any questions or make any statements. Okay, do you understand that? [Defendant nodded.]

DEFENDANT: Are you guys going to arrest me?"

The interrogation continues with defendant saying:

"I don't, I don't want it to look bad on her. I know I did it, but I don't want to lose my child and I don't want her to lose the child. It's going to devastate her, it's going to devastate me. I really didn't mean to do it, I wasn't thinking cause I was angry. *** I'm just tired, cranky, and just did it

- 4 -

without thinking.  When I realized what I did it was already too late.

* * *

Right before I went and got her [(Amber)] is when I did it.

* * *

I wasn't shaking him violently; I just shook him like [defendant demonstrates a straight-arm forward and backward shaking motion].

* * *

Not as hard as I could, but yes.

* * *

Oh, five or six times before I realized what I was doing and I put him down.

* * *

I don't know, I've only done it once or twice."

The State rested.

Mark Calhoun, defendant's father, testified on defendant's behalf.  He said he was at the hospital with Amber and defendant when Detective Dhabalt arrived.  Dhabalt indicated that he wanted to interview each of them and agreed to start with defendant because defendant had to report to work.  The detective asked defendant to accompany him to the police station for an interview and gave him directions on how to get there.  Mark told Dhabalt that defendant was not familiar with Springfield, so

- 5 -

Dhabalt offered defendant a ride and defendant agreed. When asked if he felt defendant had a choice whether to accompany Detective Dhabalt, Calhoun said, "He was very persistent in trying to get [defendant] up there."

Defendant testified that prior to Dhabalt's arrival at the hospital, defendant had given statements to various doctors, social workers, and police officers. In those statements, defendant offered several possibilities of how the child's injuries had occurred. Defendant did not admit to shaking the child but thought maybe the dog "tripped on him" or that the child had "hit his head too hard on the table."

Defendant testified that he felt he had no choice with regard to (1) riding with Dhabalt to the police station, (2) allowing Dhabalt access to his residence, (3) answering Dhabalt's questions while in the house, or (4) agreeing to be interviewed at the police station. However, defendant said that throughout the course of the police interview, he still expected that he would be going to work that evening. Defendant said he was never told that he was not obligated to speak with either detective or that he was free to leave. He said he and Dhabalt entered the police station through a nonpublic entrance in the back of the station and that the officer had to unlock the door to gain entry. Defendant said he was not handcuffed until "the very end." He said in the interrogation room, Detective Wooldridge was sitting by the door during the interview. Defendant said before he was given his Miranda warnings, the detectives asked him "multiple times" if he shook the child, to which defendant answered "no." Defendant said he had never before been charged with a crime or interrogated by the police.

Defendant testified that he eventually admitted he shook the child "[b]ecause [he] didn't believe they would let [him] go until they told--until [he] told

- 6 -

them what they wanted to hear." Prior to his admission, defendant said the detectives "seemed pushy and aggravated and rushing." After defendant admitted shaking the child, Detective Dhabalt read him his Miranda warning, but defendant did not recall signing a waiver of his rights. Without hesitation, the detectives continued their interrogation, and defendant explained exactly how he had shaken the baby.

On cross-examination, defendant said he had a high-school education with no college experience. He was considered a special-education student in high school. He said that during the police interview, the detectives did not physically threaten or mentally abuse him. The assistant State's Attorney then asked defendant the following:

"Q. So is it your testimony, sir, that it was your belief that if you confessed to a falsehood, that you would be released?

A. Yes."

At the close of the hearing, the trial court allowed the parties time to file briefs in support of their positions. On March 6, 2007, the parties presented their arguments, and the court announced its ruling. The court found defendant was not in custody when he made the first admission that he shook the child "a little." Thus, the court denied defendant's motion to suppress with regard to his pre-Miranda statement. As to the post-Miranda statements, the court granted defendant's motion, finding that defendant was in custody at the time, but there was no indication that defendant understood the Miranda warnings or that he expressly waived his rights. The court also found a Seibert violation (Missouri v. Seibert, 542 U.S. 600, 159 L. Ed. 2d 643, 124 S. Ct. 2601 (2004) (plurality op.)) with regard to the post-Miranda statements. This appeal

followed.

## II. ANALYSIS

The State claims that defendant's post-<u>Miranda</u> statements should not be suppressed because it was clear that he made the statements after acknowledging that he understood his rights. The State argues that defendant's nodding in response to Dhabalt's inquiries constituted affirmative acknowledgments of his rights, and thus any statements he made after being read his rights constitute knowing and voluntary admissions.

### A. Standard of Review

When reviewing a motion to suppress evidence, we are faced with a dual standard of review. We will reverse the trial court's findings of fact only if they are against the manifest weight of the evidence. <u>People v. Pitman</u>, 211 Ill. 2d 502, 512, 813 N.E.2d 93, 100 (2004). "This deferential standard of review is grounded in the reality that the [trial] court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." <u>Pitman</u>, 211 Ill. 2d at 512, 813 N.E.2d at 100-01. However, we consider the ultimate legal question of whether the confession should be suppressed <u>de</u> <u>novo</u>. <u>Pitman</u>, 211 Ill. 2d at 512, 813 N.E.2d at 101.

### B. <u>Seibert</u> Analysis

The question is whether <u>Miranda</u> requires the suppression of defendant's second confession--that is, his second admission that he shook the child, after <u>Miranda</u> warnings. The parties seem to disagree that the answer to that question is to be found in <u>Seibert</u>. In <u>Seibert</u>, the police intentionally withheld <u>Miranda</u> warnings hoping to

achieve a confession. Their plan worked in that Seibert confessed to the crime while in police custody without the benefit of <u>Miranda</u> warnings. The officer's plan was to cure the constitutional defect by giving the <u>Miranda</u> warnings and then eliciting the same confession after the warnings. The officer admitted that his plan was to "question first, [and] then give the warnings, and then repeat the question 'until [he] g[o]t the answer that [she had] already provided once.' [Citation.]" <u>Seibert</u>, 542 U.S. at 606, 159 L. Ed. 2d at 651, 124 S. Ct. at 2606. In a plurality opinion, the Supreme Court set forth a multifactor test for determining the admissibility of a second confession. <u>Seibert</u>, 542 U.S. at 615, 159 L. Ed. 2d at 657, 124 S. Ct. at 2612.

### 1. <u>Trial</u> <u>Court's</u> <u>Finding</u> <u>of</u> <u>Fact</u>

We agree with the State and find that <u>Seibert</u> does not apply to this case. The holding in <u>Seibert</u> applies to a two-step interrogation process, which is an interrogation process when the defendant is in police custody during all questioning. Here, the trial court found that defendant was not in police custody when he first confessed, and it therefore denied defendant's motion to suppress his pre-<u>Miranda</u> statements on that basis. Although the denial of that motion is not an appealable judgment, defendant, as appellee, is free to challenge the factual finding that he was not in custody when making his pre-<u>Miranda</u> statement. And, indeed, he does challenge that finding in the context of his argument for affirming the suppression of his second confession pursuant to <u>Seibert</u>. An appellee is not limited to the trial court's rationale but may argue for affirmance on any basis in the record. <u>People v. Reed</u>, 298 Ill. App. 3d 285, 295, 698 N.E.2d 620, 628 (1998).

Whether a defendant was in custody so as to require <u>Miranda</u> warnings is a

- 9 -

question of fact (People v. Foster, 195 Ill. App. 3d 926, 943, 552 N.E.2d 1112, 1125 (1990)), and as we have discussed, our standard of review as to questions of fact is deferential (Pitman, 211 Ill. 2d at 512, 813 N.E.2d at 100-01). In determining whether an interrogation was custodial, the trier of fact will scrutinize the objective circumstances surrounding the questioning and ask "what a reasonable man innocent of any crime would perceive." People v. Berry, 123 Ill. App. 3d 1042, 1046, 463 N.E.2d 1044, 1048 (1984). The trier of fact should consider the following factors: (1) the place of the interrogation, (2) statements or nonverbal conduct indicating that the defendant was not free to leave, (3) the extent of the police officers' knowledge and the focus of their investigation, and (4) the officers' intentions. Berry, 123 Ill. App. 3d at 1046, 463 N.E.2d at 1048. However, the trier of fact should consider the subjective intent of the officers only to determine whether the officers' behavior was consistent with their purported intent, and whether, by their behavior, they created a coercive atmosphere. Otherwise, the inquiry should focus on what the defendant thought and believed. People v. Gorman, 207 Ill. App. 3d 461, 472-73, 565 N.E.2d 1349, 1356 (1991).

Defendant argues that an interrogation room in a police station is "inherently coercive," but we are aware of no case holding that the place of the interview, by itself, is dispositive. The police never told defendant he had to remain in the interrogation room, and before he made an incriminating statement, they never physically obstructed him from leaving. Throughout the pre-Miranda interview, defendant said he expected he would be going to work that evening--suggesting that he did not consider himself to be under arrest. Initially, the police had no probable cause to arrest defendant, and he was not a suspect. Evidently, the understanding was that defendant would

- 10 -

come for an interview by his own free choice, for the police gave him directions to the police station. He preferred riding with the police because he did not know his way around Springfield. The finding that he was not in custody during his pre-<u>Miranda</u> statement is not against the manifest weight of the evidence.

### 2. <u>Application of Seibert In Light of Finding of Fact</u>

After defendant was advised of his <u>Miranda</u> rights (after he admitted to shaking the baby "a little"), the witness-interview procedure progressed into a suspect-interrogation process. From that point forward and not before, defendant was in police custody. We find that the trial court's findings that (1) defendant was not in police custody prior to the <u>Miranda</u> warnings, and (2) a <u>Seibert</u> violation occurred in this case are inconsistent with each other. Because defendant's custodial interrogation did not begin until <u>Miranda</u> warnings were given, a <u>Seibert</u> violation could not have occurred. Thus, the police here did not follow the deliberate <u>custodial</u> two-step interrogation strategy employed in <u>Seibert</u>.

### C. Whether Defendant Knowingly Waived His Right To Remain Silent

The question is whether defendant voluntarily and knowingly relinquished his rights when he admitted that on the day the child was injured, he had picked up the child from his infant seat and shook him five or six times like he had done once or twice in the past. The trial court found defendant's post-<u>Miranda</u> statements were not voluntary because the State had failed to prove that defendant affirmatively acknowledged that he understood the <u>Miranda</u> warnings.

"It is the burden of the State to show that the accused knowingly and voluntarily waived his right to remain silent before an accused's statement can be

- 11 -

admitted into evidence. [Citations.] A waiver may be either express or implied, but waiver will not be implied either from a silent record or from the fact that the defendant made statements." People v. Brown, 146 Ill. App. 3d 101, 104-05, 496 N.E.2d 1020, 1022 (1986) (the "defendant's nod constituted an express relinquishment of his right to remain silent"); see also People v. Crane, 145 Ill. 2d 520, 530, 585 N.E.2d 99, 103 (1991) ("[d]efendant, in response to being asked if he understood the Miranda warnings and if he wished to talk, nodded affirmatively. This is evidence that defendant knowingly and voluntarily waived his right to remain silent").

The recorded interview clearly shows that defendant nodded affirmatively throughout the reading of his Miranda warnings. After being read each individual warning, defendant was asked if he understood it. Each time, he nodded. After being read all of the warnings, defendant proceeded to describe in detail how and why he shook the child. Despite the great deference afforded the trial court in terms of its superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony, we find that the DVD of defendant's interrogation clearly shows defendant's voluntary relinquishment of his right to remain silent. We find that on this record, the basis of the court's ruling (that there was no indication that defendant understood his Miranda warnings) was against the manifest weight of the evidence.

### III. CONCLUSION

For the foregoing reasons, we reverse the trial court's order suppressing defendant's post-Miranda admission.

Reversed.

- 12 -

McCULLOUGH, J., concurs.

COOK, J., dissents.

JUSTICE COOK, dissenting:

I respectfully dissent. The trial court saw and heard the witnesses in this case and we should give deference to its evaluation unless it is contrary to the manifest weight of the evidence. The fact that one portion of the evidence consisted of a video-tape does not allow us to substitute our view of the facts for that of the trial judge. The court was entitled to make its decision based on all the evidence it saw and heard, not just the videotape. Based on all of the evidence, the court concluded that the officers intended to question defendant until he incriminated himself and only then give Miranda warnings. Once the officers issued Miranda warnings, defendant did not expressly waive his rights as his physical movements did not indicate defendant under-stood the warnings.

The majority holds that Seibert does not apply because the trial court found that defendant was not in police custody when he first confessed. Because the State appealed after the trial court granted, in part, defendant's motion to suppress statement, the finding regarding the custodial nature of the first statement is not on appeal. In his brief, defendant states that he believes the first statement should also be suppressed based on the trial court's Seibert finding but acknowledges that the finding is not on appeal.

Even though the majority acknowledges that the custodial finding is not "before this court," the majority uses that custodial finding to reverse the Seibert finding. The parties have not had a chance to argue the correctness of the court's custodial finding and the trial court did not have the chance to reconsider the seemingly contradictory custodial finding and Seibert finding. Despite this, the majority reverses

- 14 -

the Seibert finding assuming that the custodial finding was correct. If the trial court reconciles the findings, the court may determine that the Seibert finding should control as it erred in deciding defendant was not in custody. Alternatively, if defendant is convicted and files an appeal alleging the custodial finding was incorrect and therefore so was the Seibert finding, this court may be in the position of finding after arguments from both parties that the custodial decision was incorrect and so was our decision in this case.

The majority gives deference to an isolated factual finding made by the trial court but no deference to the trial court's ultimate decision. That approach is incorrect. "The propriety of the trial court's judgment, not its reasoning, is before us on appeal. We may affirm the trial court's judgment on any ground warranted, regardless of whether the trial court relied on it and regardless of whether the trial court's reasoning was correct." People v. Campos, 349 Ill. App. 3d 172, 176-77, 812 N.E.2d 16, 20-21 (2004); People ex rel. Waller v. 1990 Ford Bronco, 158 Ill. 2d 460, 463, 634 N.E.2d 747, 748 (1994). Facts in the record support the trial court's decision in this case even though the trial court opined that defendant was not in police custody when he first confessed.

In the Seibert finding currently before this court, the trial court determined that the police deliberately pursued a "question-first" strategy: "this is basically a [']confession first['] process, get the statement and give the warnings and then interview again." The trial court also acknowledged that in shaken-baby cases, the police always focus on family members and caregivers as suspects. The evidence in this case indicates that the police suspected only two people: (1) the father (defendant) and (2) the mother.

- 15 -

To narrow down the field of suspects, the police intended to take each of them to the station to question them. Defendant, who had no prior police contact, happened to be the first to be interviewed and unwittingly implicated himself before being warned that he could remain silent and anything he said could be used against him. Once the police had something they could use against him, they warned defendant that he had the right to remain silent and anything he said could be used against him. The officers did not tell defendant that his initial inculpatory statement could not be used against him if a court later determined that he was legally "in custody" when he made the statement. It is reasonable to assume, therefore, that the warnings meant nothing to defendant at this point as he already admitted something.

The Seibert plurality was concerned with instances "when Miranda warnings are inserted in the midst of coordinated and continuing interrogation." Seibert, 542 U.S. at 613, 159 L. Ed. 2d at 656, 124 S. Ct. at 2611. If a defendant confesses because he does not understand his rights, is told his rights, and then asked to repeat the confession so that the police can get an admissible confession, "would [it] be reasonable to find that in these circumstances the warnings could function 'effectively' as Miranda requires[?]" Seibert, 542 U.S. at 611-12, 159 L. Ed. 2d at 655, 124 S. Ct. at 2610.

An Illinois court has recognized that when police officers wait to warn a suspect of his Miranda rights until after he has confessed, the police are obviously deliberately trying to circumvent Miranda. People v. Montgomery, 375 Ill. App. 3d 1120, 1128-29, 875 N.E.2d 671, 678 (2007), quoting United States v. Williams, 435 F.3d 1148, 1159 (9th Cir. 2006) (" 'there is rarely, if ever, a legitimate reason to delay giving a Miranda warning until after the suspect has confessed. Instead, the most plausible

- 16 -

reason for the delay is an <u>illegitimate</u> one, which is the interrogator's desire to weaken the warning's effectiveness.' (Emphasis in original.)") When a "question-first" strategy is deliberately used, postwarning statements must be excluded absent specific curative steps. <u>Seibert</u>, 524 U.S. at 621, 159 L. Ed. 2d at 661, 124 S. Ct. at 2615 (Kennedy, J., concurring). The <u>Seibert</u> plurality determined that the postwarning statements before it were inadmissible after considering a series of relevant facts that showed whether the <u>Miranda</u> warnings delivered midstream were effective in accomplishing their objective. The relevant facts were as follows:

> "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." <u>Seibert</u>, 524 U.S. at 615, 159 L. Ed. 2d at 657, 124 S. Ct. at 2612.

In the present case, the police took one of two suspects to the police station, put him in an interview room with two officers, asked him if he shook his baby, and pressed him until he admitted he did. At this point, the same officers "warn" defendant and, without a break, the same officers in the same setting continue the interrogation covering the same issues. It is not unreasonable to believe that defendant considered both interrogations "as parts of a continuum, in which it would have been unnatural to refuse to repeat at the [later] stage what had been said before." <u>Seibert</u>, 542 U.S. at 617, 159 L. Ed. 2d at 658, 124 S. Ct. at 2613.

- 17 -

Since defendant already implicated himself by the time the officers issued the Miranda warnings, defendant may not have understood the warnings as applying in light of his confession and defendant's physical motions may have been reactive responses and not meaningful waivers.  The trial court had the benefit of observing the police and defendant both in court and on tape and determined that defendant's movements were not responsive and did not indicate he understood his rights.  This determination was not against the manifest weight of the evidence.