THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SALVADOR RUBIO, Defendant-Appellant.

Second District    No. 2—07—0320

Opinion filed July 6, 2009.

BURKE, J., specially concurring.

Thomas A. Lilien and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

Philip J. Nicolosi, State's Attorney, of Rockford (Lawrence M. Bauer, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Robert E. Davison, of Springfield, for the People.

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant Salvador Rubio appeals his conviction of and sentence for first-degree murder. The evidence at trial, which included incriminating statements defendant made during interviews with police, indicated that defendant and an acquaintance were walking through the parking lot of a bar when his acquaince unlawfully entered an unoccupied car. The car's owner, alerted to the intrusion, confronted defendant's acquaintance. During the ensuing scuffle, defendant shot and killed the owner. On appeal, defendant argues that the trial court erred in denying his motion to suppress his confession to police and that the 60-year sentence imposed by the trial court was excessive. For the reasons that follow, we affirm the judgment of the trial court.

Prior to the start of trial, defendant moved to suppress his statements to police, and the trial court held a hearing on defendant's motion. The court first heard preliminary testimony from several officers who watched defendant while he was in police custody, the detectives who brought defendant from his home to the police interview room, and the officers who set up and used the video equipment that recorded defendant's interview. Next, Detective Vincent Lindberg testified that he interviewed defendant and his acquaintance after receiving a tip that they had been involved in the shooting. Lindberg recalled that he and Detective Glen Heidenreich obtained a confession from defendant's acquaintance just before defendant arrived at another police interview room in the same building. Lindberg testified that he and Heidenreich then interviewed defendant; the interview began at 6:43 p.m. Lindberg said they began the interview by notifying defendant of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)) and informing him that the interview would be videotaped. A copy of a *Miranda* rights waiver form, with defendant's handwritten initials appearing next to each line describing defendant's rights, was admitted into evidence. Lindberg stated that the night's interview with defendant lasted approximately 2½ hours. (The recording of the interview establishes that defendant confessed to the shooting approximately 1½ hours into the interview.) During his testimony, Lindberg also described subsequent interactions with defendant, including "drive-arounds" and another taped interview, in which defendant gave police additional information about the shooting.

During his testimony, Heidenreich agreed that he falsely told defendant during the interview that the murder had been recorded by a bar security camera and that two witnesses had identified him during or after the shooting. (When recalled for cross-examination, Lindberg acknowledged Heidenreich's false statements, as well as his own false statement to defendant that he believed the shooting to have been an accident.) Heidenreich also agreed that defendant asked to call his mother three times during the interview but that defendant was not allowed to do so. Heidenreich acknowledged that, in order to induce defendant's confession, he made several statements to defendant regarding the virtues of telling the truth, such as the statement that the " 'truth [would] set [him] free.' " (Heidenreich testified that the reference to defendant being freed by the truth was "[a]bsolutely not" a reference to his literally being set free, but rather was a reference to his freeing himself from "the monkey that[ ] [was] on his back.")

The State's final witness at the hearing on defendant's motion to suppress was Detective Jeff Schelling, who had read defendant his *Miranda* rights in an unrelated case approximately six months before the interviews in this case. Schelling said that defendant appeared to understand his *Miranda* rights and even indicated that he had been informed of his *Miranda* rights on previous occasions.

The video of defendant's interview with police was admitted as evidence on the motion to suppress. At the beginning of the video, the detectives informed defendant that the interview would be recorded on video, and then Heidenreich reviewed a *Miranda* waiver form with defendant. A video transcript included in the record on appeal includes the following exchange:

"[HEIDENREICH]: And before we talk about anything, just because you know we're here, just the way things work, I have to read you your rights, okay, and I got to make sure you understand your rights. Can you read and write?

[DEFENDANT]: Yeah, I can read.

[HEIDENREICH]: Read this top line for me.

[DEFENDANT]: It says before you are asked any questions you must understand your rights."

(The first line of the form, which is included as an exhibit in the record on appeal, actually says, "Before we ask you any questions, you must understand your rights.")

In his brief, defendant argues that the transcript is incorrect at this point and that he actually said, "Before *you ask* any questions, you must understand your rights." (Emphasis added.) On reviewing the video, we find the transcript version to be correct.

The exchange continued:

"[HEIDENREICH]: Bear with me here, okay. Why don't you go ahead and take that pen and initial next to that."

As defendant initialed the form, he asked "What's this for?" Heidenreich responded, "I'll explain everything," and then continued going over the form:

"[HEIDENREICH]: And this one says that you have the right to remain silent, do you understand that one?

[DEFENDANT]: Uh-huh.

[HEIDENREICH]: Go ahead and initial there.

[DEFENDANT]: (Complies.)

[HEIDENREICH]: Once we're done I'll explain everything to you."

At this point, defendant in his brief again challenges the accuracy of the transcript. He asserts that defendant did not say "Uh-huh," but rather made "an ambiguous sound." Our review of the video indicates that defendant made an "Mmm-hmm" sound with the rising inflection that normally accompanies an affirmative response and then said something inaudible due to cross talk, perhaps either "I think so" or "I believe so."

Heidenreich next told defendant, "Anything you say can be used against you in a court of law; do you understand that?" In response, defendant, who had been leaning over the waiver form with both elbows on the table in front of him, flipped his pen down on the form and swayed back for a moment so that he was sitting upright, then leaned back over the form and asked, "What is this for?" The conversation continued:

"[HEIDENREICH]: I have to read you these. Once we're all done with this I'll explain it. If you don't want to talk to me then, you don't have to talk to me.

[DEFENDANT]: I mean I want to talk. I'm saying I don't know what you talking about.

[HEIDENREICH]: So the secret is all out then because I can't tell you anything until we do all this.

\* \* \*

[HEIDENREICH]: You have the right to talk with a lawyer before questioning and to have a lawyer be present with you during questioning; do you understand that?

[DEFENDANT]: Yeah.

[HEIDENREICH]: I need you to initial there (indicating).

[DEFENDANT]: (Complies.)"

In his brief, defendant challenges the accuracy of this portion of the transcript—he argues that he did not say "Yeah" but instead

responded with something "closer to an inaudible mumble." Defendant is nearer to the mark on this point. Our review of the video tells us that defendant exerted a monotone "Mmm" before initialing the form. However, the sound still gives the impression of an affirmative response.

Heidenreich then read the next *Miranda* right from the waiver form:

> "This one says if you cannot afford a lawyer one will be appointed to you prior to any questioning if you so desire; do you understand that? I need you to initial right there (indicating).
>
> [DEFENDANT]: (Complies.)"

Although neither party raises the issue, we note that, on the video of the interview, defendant seems to offer a quiet, somewhat protracted "Yeah" just after Heidenreich finishes the question and just as Heidenreich asks him to initial the form.

Heidenreich next read defendant the final line on the waiver form, which says, in all capital letters, "I UNDERSTAND THESE RIGHTS AND AGREE TO ANSWER QUESTIONS," and asked defendant to initial next to and sign under the line. Defendant complied, and the interview began as follows:

> "[HEIDENREICH]: Okay; Detective Lindberg and myself are the ones that stopped by your house earlier.
>
> [DEFENDANT]: You're the one that told my mom and said I broke—stole a car.
>
> [HEIDENREICH]: No, she got something messed up. We didn't say you stole a car.
>
> [DEFENDANT]: Because I was going to say.
>
> [HEIDENREICH]: We had information that you had got into a car, okay? And do you know what we're talking about?
>
> [DEFENDANT]: (Shakes head.)
>
> [HEIDENREICH]: No idea what we're talking about?
>
> [DEFENDANT]: No, cuz, you know what I'm saying—well, keep talking to me. I want to know what you guys—."

The detectives then questioned defendant for approximately 15 minutes on his interests and acquaintances, as well as his whereabouts on the day of the shooting, before revealing the purpose of the interview:

> "[LINDBERG]: Well, Detective Heidenreich and I have been working on this case for about three weeks now, *** and we have found out that it's clear with all our resources and everything that we have here in the Sheriff's Department our investigation clearly shows that you're involved in the shooting at the Two Wheel Inn.
>
> [DEFENDANT]: What?
>
> [LINDBERG]: There is no doubt. So I mean people make mistakes, Sal, and what you're telling us—

[DEFENDANT]: No.

[LINDBERG]: Now listen.

[DEFENDANT]: Why you guys—

[HEIDENREICH]: Hold on, let me point something out, okay? Do you remember that big light up at the corner of the building there at the Two Wheel Inn?

[LINDBERG]: Pretty bright.

\* \* \*

[HEIDENREICH]: The bright light that shines down, it has kind of an orangish glow to it, there is a camera right below it; okay?

[DEFENDANT]: What, are you all?"

The detectives then explained to defendant that they knew he lied to them about his whereabouts on the night of the shooting, and Lindberg continued:

"Sal, listen to me, listen to me, you made a mistake that night, your friend was getting the shit kicked out of him.

[HEIDENREICH]: An honest mistake.

[LINDBERG]: Your friend was getting the shit kicked out of him and you felt like you had to protect him and you did something you shouldn't have done. We know about that, man. We know you're scared about it; okay.

[DEFENDANT]: I don't know what you all talking about."

The detectives pressed defendant further on his story, and in doing so they told him that his lying would give the appearance that he planned the shooting. Heidenreich explained to defendant that "there is a difference here in if you planned to do this or this was something that was a total surprise," and Lindberg explained that there is a difference between a person who "says I screwed up, I made a mistake, it wasn't intentional, it wasn't something that I meant to do, it was just something that happened" versus "the person who plans stuff out, \*\*\* who is evil, \*\*\* who is cunning."

Thirty minutes into the interview, as defendant continued to deny any involvement in the shooting, and as the detectives continued to challenge his story, the following exchange took place:

"[DEFENDANT]: This is a nightmare right here.

[LINDBERG]: It's been a nightmare for you for awhile.

[HEIDENREICH]: We're not trying to jack you up here, okay, but the fact is this is the way it is and it's not going to go away. It's not going to go away until we get done with this and you don't want to carry this around on your back forever, do you?"

Defendant persisted in his denials, and the detectives continued to try to convince him to confess:

"[HEIDENREICH]: If you know what happened, if this was not something that you planned on doing, this is the time to make it right; okay? The only time you shouldn't worry about making it right is if you went out there planning on doing this, planning on killing that guy. If you went out there and this was something that happened spur of the moment, you didn't expect this guy to come out, things got heated, whatever happened happened, and this is the way it ended up, this is the time to make it right. It's not later when you don't have the chance; okay?

\* \* \*

[LINDBERG]: Later is too late.

[DEFENDANT]: All I know I never killed nobody. I never shot nobody.

\* \* \*

[LINDBERG]: \*\*\* Give us an explanation on what happened. Detective Heidenreich is exactly right, you don't want this thing to go on any further with the lies because then it's too late, you can't correct it. Right now is the time to come out with the truth and say what happened."

The detectives told defendant that his silence was making them question their assessment that he was not a cold-blooded killer but had instead acted in the heat of the moment, and they continued to urge him to confess:

"[LINDBERG]: \*\*\* [D]on't make yourself look like a liar, man, don't make yourself look any worse than it already is. Hey, \*\*\* a bad thing happened that night and there is nothing you can do to take that bad thing back but there is something you can do to make us look at this in a different light. I don't think \*\*\* you're a murderer, man. People who murder people sit out there and plan stuff out and they make their moves and they do everything just perfectly and the whole thing, that's not what this was, this was a sporadic action that happened because a friend was in trouble. \*\*\* I can understand helping a friend out and I can understand that a person gets scared and does something he shouldn't do but for God sakes, \*\*\* don't make this look to be anything more than it is; okay."

When defendant would not relent in his denials, the detectives asked defendant for contact information to check his alibi. During this conversation, defendant told the detectives he would have to speak with his mother to get his father's telephone number; Lindberg said he would call defendant's mother instead. Shortly after that portion of the conversation, defendant said, "I can't even talk the way my throat hurt," and asked for water, which Lindberg brought him.

Just under one hour into the interview, defendant said that he knew what "the right thing" to do was, and Heidenreich encouraged him to be honest:

"But what I'm saying is you're a young man, you got a long life ahead of you and this is something that you can get over; okay? But as long as you're uncooperative, it's not going to look good. If you're remorseful and you're honest about it, that's the part that looks good, that's what I'm saying, you got a good chance of getting by."

Defendant then retreated to his alibi, and Heidenreich emphasized that a false alibi would not help him:

"[HEIDENREICH]: Look, you and I both know it's not going to make a difference if we get a hold [sic] of [an acquaintance defendant identified in his alibi], okay, we both know that. This is not going to go away until you get honest. You know we could go hunt down [the acquaintance] and you know what he's going to tell us ***[.]

[DEFENDANT]: Man, I don't even feel so good, man.

[HEIDENREICH]: Well, I can understand that.

[DEFENDANT]: I don't feel so good, for real.

[HEIDENREICH]: Well, that happens. I mean a lot of times when you're talking to someone about stuff like this they don't feel good, they get dry in the mouth and they get nervous, they're scared. I mean that's what's going on, you're scared. There is nothing wrong with admitting to being scared.

[DEFENDANT]: This i[s] crazy. Man, I need to talk to my mom real quick."

After a brief pause, the conversation continued:

"[HEIDENREICH]: You remember that big orange light that I talked to you about?

[DEFENDANT]: Uh-huh. The orange light?

[HEIDENREICH]: *** [T]he one in the parking lot there, you know which one I'm talking about?

[DEFENDANT]: Keep going.

[HEIDENREICH]: Huh?

[DEFENDANT]: Keep going, keep talking to me.

[HEIDENREICH]: Well, if you're not listening.

[DEFENDANT]: I mean I'm listening, I'm listening, I'm just, man, I don't know. My stomach hurt.

[HEIDENREICH]: What can I do to help your stomach?

[DEFENDANT]: I don't even know.

[HEIDENREICH]: You want me to tell you what you can do to help your stomach? All that will go away as soon as you stop hiding everything."

At that point in the interview, Lindberg told defendant that police had a witness who identified him in the parking lot where the shooting took place and two witnesses who saw defendant after the shooting. Lindberg then raised the possibility that the shooting was accidental or was an act of self-defense, and he asked defendant for his side of the story. Lindberg also told defendant that police had talked to one of defendant's friends, Josh, who had told them that defendant at one point called him and seemed inclined to turn himself in for the shooting. Lindberg characterized defendant as "a person with a conscious [*sic*]," "[a] person that wants to set things straight," and "not such a bad person." Defendant then asked for some fresh air, and Lindberg offered to bring Josh into the interview room so that defendant could verify that the detectives were telling him the truth about Josh's statement. While Lindberg was out of the room, Heidenreich and defendant continued to talk:

"[HEIDENREICH]: *** There is no way we would know this stuff if [defendant's phone conversation with Josh] didn't happen and you know that so it don't matter if Josh comes in here or not. You know that as well as I do.

[DEFENDANT]: I guess.

[HEIDENREICH]: You don't believe he's here?

[DEFENDANT]: Oh, I know he's here. I know he's here because I did call. Damn, I got to use the bathroom. Can I use the bathroom?"

Heidenreich gave defendant a bathroom break, and, shortly after they returned to the interview room, Lindberg arrived with the acquaintance (not Josh) who had been with defendant on the night of the shooting. The acquaintance told defendant that the police "already know the truth" and then left. The detectives continued to try to persuade defendant to tell his side of the story:

"[LINDBERG]: We're not lying to you and Josh is going to come up here and say the same thing. I mean, holy cow.

[HEIDENREICH]: And it's looking real good for him because he's making things right.

[LINDBERG]: That's right.

[HEIDENREICH]: He's a shining star right now.

[LINDBERG]: Think about it in the eyes of everything. If a guy tells the truth—

[HEIDENREICH]: Pretend you're a judge, okay, you got a guy coming in front of you that admits to everything and he's honest and he's told the truth and then you got this guy coming in front of you that denies everything but you got all the proof ***—but he's denying everything, which one are you going to hammer, which one are you going to believe more, which one if you were the judge, what would you do to you right now?

[LINDBERG]: The truth, remember those lies—

[HEIDENREICH]: The truth will set you free.

\* \* \*

[LINDBERG]: \*\*\* I don't think this was like a murder. I think this was something that happened because you were protecting your friend. Lots of people think murders are like when you go out and you plan something like a hit, like the Mafia makes a hit on somebody."

Now at approximately 8 p.m., 1 hour and 15 minutes into the interview, the detectives continued to work toward a confession:

"[LINDBERG]: \*\*\* Now, it makes sense, you go along with somebody and you kind of cover their back side and the next thing you know they're getting into some shit and you got to bail them out and that's what this looks like to me. It looks like you're bailing him out. I'm telling you, what he said, man, it sounds corny, it sounds really corny but the truth will set you free meaning that you won't have that burden anymore in your heart. Obviously something was bothering you if you talked to Josh about this and say, hey, man, I want to go down and talk to the police and straighten this up."

Defendant then asked for a break in the interview so that he could have a cigarette, but he and Lindberg continued to talk:

"[LINDBERG]: You want a diet Pepsi or something?

[DEFENDANT]: No, I want fucking—I wish I was dead.

[LINDBERG]: No, you don't, man.

[DEFENDANT]: Yes, I do.

[LINDBERG]: No, you don't, don't say that, man.

[DEFENDANT]: I'm going to kill myself.

[LINDBERG]: You don't want to do that. Hey, look at me, you're a young guy, okay, mistakes are made. You think I was bullshitting—

[DEFENDANT]: All right, look; all right, man, okay. Man, I can't talk, man."

(In this last passage, defendant cut Lindberg off to say "All right, look; all right, man, okay" with a decisive cadence, but he quickly shifted to saying "Man, I can't talk, man" with a more nervous, perhaps resignedly frustrated, air. As he lost his nerve, he lowered his head and gently bumped his forehead on the table, so as to create a low thumping noise.)

As the interview continued just past 8:05 p.m., defendant told the detectives he was going to "come at [them] straight" but he "just need[ed] some fresh air." The detectives promised to take him for fresh air, and defendant allowed that "it[ ]" was "going to look bad as hell." Defendant then again became reticent to confess and expressed concern about his future. The interview continued:

"[HEIDENREICH]: So play it to us straight.

[LINDBERG]: Please do, don't feed us any more crap.

[DEFENDANT]: I can't even talk, man."

Lindberg expressed sympathy for defendant's position and the detectives again urged defendant to confess:

"[LINDBERG]: I'm telling you straight up, man, don't make yourself look like a liar anymore, it's not worth it. Put this thing behind you, get it done with, get it over with, explain to us in your own words what happened.

[HEIDENREICH]: The sooner you get this over with the sooner you get on with your life. This is not the end of your life.

[LINDBERG]: Explain to us—

[HEIDENREICH]: This is the end of a bad part of your life."

During the ensuing conversation, Lindberg referenced defendant's comment that it was going to look bad for him, and Heidenreich added, "It looks good for you now, better than the way it was." The conversation continued for a short time before Lindberg momentarily left the room; defendant was quiet and apparently contemplative during Lindberg's absence. When Lindberg returned, the following colloquy took place:

"[LINDBERG]: *** I've given you [your requests—water and a cigarette—] I'll give you the walk with fresh air but you have to be honest with me and tell me what happened that night, that's all I'm asking for.

[DEFENDANT]: Man, I can't talk."

(Defendant's sentence was preceded by a protracted silence from all three men.) Shortly after this point in the interrogation, at approximately 8:15 p.m., after further prodding from the detectives, defendant began to confess.

At the end of the hearing on defendant's motion to suppress, the trial court heard arguments from the parties and ruled that defendant's rights waiver was valid and that his confession was voluntary and therefore admissible. With respect to the rights waiver, the trial court found that defendant signed the waiver form, "appear[ed] to understand" his rights, and had been read his *Miranda* rights on previous occasions. With respect to the voluntariness of the confession, the trial court found that the detectives were "patient but persistent" in questioning defendant and that they did not make him any promises in exchange for his confession. The trial court further observed that defendant was given a break and was offered food and water during the interrogation and that, even though defendant's requests to call his mother were denied, defendant did not appear anxious during the interview. The trial court noted that the detectives may have deceived defendant by falsely stating their evidence against

him, but the court added that even "out-and-out lie[s] to a suspect" do not necessarily render a subsequent confession involuntary.

With his confession admitted at trial, the jury convicted defendant of first-degree murder. At the sentencing hearing, defendant's father and sister testified to defendant's good character, the woman who accompanied the victim on the night of the shooting testified about the harm caused by the victim's death and about the impact the incident had on her, and a prison officer testified that the prison elevated the security precautions used in dealing with defendant after an alleged incident involving defendant.

The presentence report indicated that defendant's juvenile record included an adjudication for damage to property and that he violated his subsequent probation by failing a drug test, possessing a firearm, resisting arrest, and not enrolling in school. Defendant's juvenile probation discharge stated that he had begun to " 'buy into' " the probation program and address his marijuana use, take steps to enter an educational program, and acknowledge the need to break past gang ties. The report also indicated that, in the personal history he gave, defendant stated that he had been accepted into an educational program but that "he was using [marijuana] daily since the age of 16 until his arrest for this case." The report noted that, according to defendant's juvenile probation records, "defendant had several positive urine drops for marijuana" but did not complete a drug treatment program "due to poor attendance." The report also said that "defendant admitted to being a member of [a particular street gang] and said he [was] a '1st young new member.' "

At the conclusion of the hearing, the court announced defendant's sentence. It began by stating that it had taken into account the relevant factors in aggravation and mitigation, the need to protect the public, and the cost of incarceration. The court then continued:

"With regard to the first *** factor in aggravation, whether or not [defendant's] conduct caused or threatened serious harm ***.

Obviously *** the fact of death and harm is implicit in a first degree murder *** conviction, and [the law] does prevent the court from taking the fact of a death or harm of that nature into account. ***

However, the court may certainly consider the facts and circumstances of the death that resulted, and that is permissible, so I'm not considering any factors that are implicit in this offense, but I am considering the nature and circumstances of how this offense was committed.

*** [T]he testimony included testimony of where the bullet entered the decedent. *** It included the fact that it was [defendant]

who brought the gun originally, that it was [defendant] who did target practice in [his] basement, and that it was during the course of a struggle that it was [defendant] who did have possession of the gun and did discharge that gun in a manner that did cause the death of [the victim].

The court also as a factor in aggravation *** has looked at [defendant's] prior history of criminal activity, [his] delinquency. Certainly [defendant] had not lived a law abiding life prior to commission of the offense. *** [Defendant was] on *** probation at the time [of the shooting]. That probation was for *** property offenses.

But [defendant's] probation was violated by [his] possession of a handgun and a handgun of different caliber than that used [in the shooting]. ***

The court also can *** look at [defendant's] character and what [his] focus was at the time. Certainly it wasn't on school ***.

[His] sister testified that *** she and [defendant's mother] *** tried to get [defendant] into an educational program, but the presentence report points out that [defendant] certainly didn't put much of an effort at the time [he] [was] in a regular school program.

There were opportunities *** for people who have the talent that [defendant has] ***, but it doesn't appear *** that that was the focus of [his] interest, and that the focus of [his] interest was gang affiliation, was *** illegal drugs, and was criminal activity. ***

* * *

Not only did [defendant] have prior gang activity but according to the presentence report there is current gang affiliation or certainly very recent affiliation with [a certain gang].

Certainly while [defendant] [was] a young person, and perhaps that can be considered in mitigation, and that the length of [defendant's] record isn't that long, but again [defendant] [is] someone who is young, the court can look at how [defendant] led [his] life and what [his] priorities were. ***

The court does believe that deterrence is an important factor certainly in a case as serious as this.

* * *

Certainly [defendant] did have the choice of whether or not to *** take the gun from [his acquaintance] and discharge that gun. *** [T]here were decisions made albeit spur of the moment decisions perhaps in terms of how [to] handle that situation, but [defendant's] decisions amounted to the decision to discharge that gun rather than to run away or use some other means to assist [his] friend.

* * *

> At this time the court hereby sentences [defendant] to a term [of imprisonment] *** of 30 years ***.
>
> The court pursuant to [a statutory provision requiring an additional sentence for murder committed with a firearm] hereby sentences [defendant] to an additional term of 30 years ***."

Defendant timely appeals.

Defendant's first argument on appeal is that the trial court should have granted his motion to suppress his confession because he did not knowingly waive his *Miranda* rights. "A court of review will accord great deference to the trial court's factual findings, and will reverse those findings only if they are against the manifest weight of the evidence; however, the [appellate] court will review *de novo* the ultimate question posed by the legal challenge to a trial court's ruling on a motion to suppress." *People v. Braggs*, 209 Ill. 2d 492, 505 (2003).

In his reply brief, defendant challenges the application of the above standards to this appeal by asserting that the "recording of the interrogation session rendered the lower court's fact-finding role obsolete, insofar as it applied to the recorded events." According to defendant, because the interview was recorded, the trial court's ruling must be considered an "application of the law to undisputable facts," such that we should review all aspects of the trial court's ruling *de novo*.

Were this question a matter of first impression, we would be inclined to disagree with defendant's position. There is, at first glance at least, merit in defendant's point that, when a reviewing court has the opportunity for a full viewing of the same evidence upon which the trial court based its ruling, much of the reason for affording deference to the trial court disappears. However, a deeper look reveals the trouble with defendant's argument. The deference afforded the trial court on issues of fact is based not only on the trial court's superior vantage point, but also on the notion that it is the trial court's prerogative, and perhaps even its role, to assess the facts in the first instance. *Cf. Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1144 (2004) (repeating idea that standards of review reflect an evaluation of the institutional competence of each level of the court system). Even in cases where a trial court's factual findings are based on a record that an appellate court has equal opportunity to view, the appellate court's intrusion into the fact-finding role would have unfortunate effects. A finding of fact, even based on documentary evidence, is necessarily influenced by the latent biases that spring from the fact finder's world view and personal identity—two people with differing backgrounds may interpret the same video recording in two very distinct ways. See D. Kahan, D. Hoffman & D. Braman, *Whose Eyes Are You Going To Believe? Scott v. Harris & the Perils of Cognitive Illiberal-*

*ism*, 122 Harv. L. Rev. 837 (2009). To allow a reviewing court considering a factual question based on documentary evidence to examine the issue *de novo*, without regard for the conclusions of the original fact finder, is to ignore this reality and allow the higher court to privilege its latent biases over those of the jurists whom the law charges with the duty to determine such factual questions. Worse, this *de novo* approach applied to a jury's finding of fact after a trial would remove the fact interpretation from a jury, whose composition and deliberative process are designed to incorporate and reconcile diverging perspectives, to a reviewing court that is much less likely to have those advantages.

Further, allowing *de novo* review of factual questions predicated on documentary evidence would upset the procedural efficiencies of our court system. As the United States Supreme Court has stated in applying the Federal Rules of Civil Procedure:

> "The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much. As the Court has stated in a different context, the trial on the merits should be 'the "main event"… rather than a "tryout on the road." ' " *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 574-75, 84 L. Ed. 2d 518, 529, 105 S. Ct. 1504, 1512 (1985), quoting *Wainwright v. Sykes*, 433 U.S. 72, 90, 53 L. Ed. 2d 594, 610, 97 S. Ct. 2497, 2508 (1977).[1]

Aside from the consequences to which the Supreme Court referred, our applying the *de novo* standard of review to findings of fact based

---

[1] This passage overstates the case somewhat by characterizing trial court proceedings as no more than a "tryout." *De novo* appellate court review of factual findings based on documentary evidence would entail no additional presentation of evidence but would instead rely on the evidentiary record developed at the trial court level. Thus, under a *de novo* scheme, the parties would be bound by the record they developed at trial; an appeal would not give them a full second chance. Nonetheless, the Supreme Court's basic point, that *de novo* determination of facts encumbers the appellate process, still holds.

on documentary evidence would have at least two additional effects. First, such a holding would allow advances in record-keeping to alter the precepts of appellate review. See *United States v. Santos*, 403 F.3d 1120, 1128 (10th Cir. 2005) ("The increasing availability of videotapes of traffic stops \*\*\* does not \*\*\* alter our precedent to the effect that appellate courts owe deference to the factual findings of district courts"). This alteration could become far-reaching as videotaping becomes more prevalent, up to the point that it could fundamentally change the nature of appellate review were trials themselves to be videotaped. See *Conservatorship of the Person & Estate of McElroy*, 104 Cal. App. 4th 536, 546, 128 Cal. Rptr. 2d 485, 491 (2002).

Second, a holding that an appellate court should review *de novo* a trial court's factual findings based on documentary evidence, such as a video recording, would complicate existing principles for determining the applicable standard of review. As the law now stands, the standard of review for a given issue on appeal is determined by the type of issue being considered on appeal, not by the strength or type of evidence that informs the issue. Quite simply, issues of fact must be resolved under the manifest-weight standard of review (*e.g.*, *People v. Pitman*, 211 Ill. 2d 502, 512 (2004)), applications of trial court discretion must be reviewed for abuse of discretion (*e.g.*, *In re D.T.*, 212 Ill. 2d 347, 356 (2004)), questions of law must be reviewed *de novo* (*e.g.*, *Pitman*, 211 Ill. 2d at 512), and, in appeals from administrative decisions, questions involving an agency's application of the law it is charged with administering to facts (mixed questions of law and fact[2]) will be reviewed for clear error (*City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998)). By holding that the definitiveness of the record can alter the standard of review, we would invite an *ad hoc* patchwork of standards that would vary with the type of evidence contained in the record or even the particular evidence (the video or the testimony) on which the trial court seemed to base its opinion. We would thus introduce unnecessary minutiae into what is now a relatively simple area of the law.[3]

---

[2]In his briefs, defendant twice states that review of a trial court's decision on a motion to suppress presents "mixed questions of law and fact." This use of the phrase, which also appears in many published decisions, is incorrect. The phrase "mixed question of law and fact" is a term of art reserved for review of an agency's application of the law with which it has expertise to a given set of facts. Review of a trial court's decision on a motion to suppress can potentially present *separate* questions of law and fact, depending on the arguments raised on appeal.

[3]The question of whether the trial court relied solely on documentary evidence, or also on testimony, or whether particular findings were based on

Further, defendant is wrong to assume that current concepts of manifest-weight review cannot accommodate the increased scrutiny that may accompany a more definitive factual record. In an appeal where a trial court's findings clearly contradict objective evidence—for example an audio and/or video recording such as the one at issue here, photographs, or even the trial transcripts or documentary evidence that is customarily included in appellate records—a reviewing court would overturn the erroneous findings under the manifest-weight standard, just as it would under a *de novo* standard, because a factual finding contradicted by such conclusive evidence would be against the manifest weight of the evidence.[4] Especially since the existing rules governing standards of review can already accommodate review of the more definitive record containing objective evidence (such as a video recording), we would decline to abandon those rules by carving out an exception for issues involving recorded interviews. Instead, we would adhere to the same rules for standards of review that have held to this point.

However, as we observed at the outset, this is not a matter of first impression. Our supreme court has very recently spoken on this issue. In *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446 (2009), the supreme court attributed our typical deferential standard of review on factual questions solely to the trial court's superior vantage point for assessing credibility, and it therefore held as follows:

"In this case, the trial court heard no live testimony. *** The trial court was not required to gauge the demeanor and credibility of witnesses. [Citation.] Instead, the trial court made factual findings based upon the exact record presented to both the appellate

one or the other or both, could also become a contentious and confusing issue in many appeals in which facts based on documentary evidence are contested. This very issue has raised a dispute between us and the special concurrence.

[4]The resolution of an issue may hinge on the standard of review where, even with the objective evidence, the record is ambiguous on an issue of fact (such as where the record contains a video recording but the recording is inconclusive). In that case, manifest-weight review would mandate deference to the trial court's interpretation of the facts, while *de novo* review would require that the reviewing court consider the factual issue anew. Again, because our customary deference to the trial court's findings of fact reflects both the trial court's superior vantage point *and* its institutional competence and role in deciding such matters, our having the same vantage point as the trial court (as we do when we and the trial court review the same video recording) does not proscribe continued deference to the trial court's findings. Thus, even in that case, manifest-weight review of the question of fact would be appropriate, but the more definitive record would cause the manifest-weight review to be more probing.

court and to this court. Without having heard live testimony, the trial court was in no superior position than any reviewing court to make findings, and so a more deferential standard of review is not warranted. Thus, although this court has not done so recently, we reiterate that where the evidence before a trial court consists of depositions, transcripts, or evidence otherwise documentary in nature, a reviewing court is not bound by the trial court's findings and may review the record *de novo*." *Addison Insurance Co.*, 232 Ill. 2d at 453.

The special concurrence interprets *Addison Insurance Co.* very narrowly as creating a *per se* rule requiring *de novo* review for factual questions only where the trial court hears no live testimony and requiring deferential review for factual questions in any case in which testimony is presented (see 392 Ill. App. 3d at 941), and the State echoes this position in its petition for rehearing. There is language in the above passage to support this view: the supreme court based its application of *de novo* review in part on the idea that the trial court heard no live testimony and was not called upon to gauge the credibility of witnesses. However, as noted, the supreme court also appears to have relied on the idea that factual findings based on documentary evidence, or "based upon the exact record presented to *** the appellate court," are not entitled to deference. This principle extends to cases in which the trial court hears testimony along with the documentary evidence, if the trial court's ruling is based on the documentary evidence and is unaffected by the testimony. Further, the special concurrence relies on a nuance—the idea that a trial judge could make findings with respect to documentary evidence in the context of the totality of the remainder of the factual record—that, like the many considerations we discuss above, the supreme court implicitly deemed inconsequential with the succinct statement of the law we quote above. We interpret that statement to mean that a finding of fact is not entitled to deference where it is based on documentary evidence that a reviewing court has equal opportunity to assess, even if the trial court also heard live testimony that did not affect the finding.

■ The question here becomes whether the trial court's factual findings were based entirely on documentary evidence that we have equal opportunity to view (the video of defendant's confession), or whether they were affected by live testimony from the police officers describing the confession. All of defendant's arguments on appeal concern matters portrayed in total on the video recording, and the officers' testimony describing the interrogation added nothing that was not already portrayed, and portrayed more completely, on the video.

Further, all of the trial court's factual findings appear to have been predicated on the contents of the video recording; at several points during its ruling, the trial court referenced the precise times of certain events during the interview, facts the trial court could have drawn only from the video recording. Therefore, the record demonstrates that the live testimony did not affect the trial court's assessment of the facts surrounding defendant's interrogation, and the trial court's hearing testimony on the same subject does not provide an independent reason for deference to the trial court's decision. Because the trial court's factual findings were based on documentary evidence that we have equal opportunity to view, we follow *Addison Insurance Co.* and review those findings *de novo*.

With that, we move to address defendant's argument that he did not knowingly waive his *Miranda* rights. In *Miranda*, the Supreme Court announced a set of rules meant to protect criminal suspects' rights under the fifth amendment to the United States Constitution, which provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V; *Miranda*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. Under *Miranda*, the prosecution may not use statements stemming from custodial interrogation of a suspect unless the suspect was first informed of, among other things, his rights to remain silent and speak with an attorney, and, if the suspect indicates that he does not wish to be interrogated, the police may not question him. *Miranda*, 384 U.S. at 444-45, 16 L. Ed. 2d at 707, 86 S. Ct. at 1612. Although a suspect may waive his or her *Miranda* rights and agree to speak with police (*People v. Brown*, 301 Ill. App. 3d 995, 1001 (1998)), the waiver will be considered valid only if it was voluntary, knowing, and intelligent. *People v. Bernasco*, 138 Ill. 2d 349, 352-61 (1990).

■ Defendant argues that his waiver was not knowing and intelligent. In order to be considered knowing and intelligent, a waiver must reflect an intentional relinquishment or abandonment of a known right or privilege. *Bernasco*, 138 Ill. 2d at 360-61. Whether a waiver is knowing and intelligent is determined by the particular facts and circumstances of the case, including the background, experience, and conduct of the accused. *Braggs*, 209 Ill. 2d at 515.

Although defendant characterizes his argument as a legal question involving the trial court's application of the law to settled facts, his contentions rest on factual questions about whether he actually indicated his understanding of his rights and whether the video recording transcript, which says that he indicated understanding, is accurate. We resolve the questions of fact regarding the accuracy of the transcript above, in our description of defendant's responses when

Heidenreich asked him to verify that he understood the rights Heidenreich was describing. Defendant also relies on the discrepancy between the exact language contained on the form and his recitation of the language when Heidenreich asked him to read it. As we note above, the top line of the *Miranda* form stated, "Before we ask you any questions, you must understand your rights," but, when asked to read the top line, defendant said, "It says before you are asked any questions you must understand your rights."[5] Defendant contends that this discrepancy indicates his lack of understanding of the form. We disagree. From defendant's language and demeanor, we view defendant's answer as a colloquial paraphrase of the actual words printed on the form. His ability to read the form and then paraphrase it actually acts as a stronger indication of his understanding than would have his simple repetition of the language on the form.

Defendant's last factual contention about the *Miranda* waiver is based on his interpretation of his twice asking, "What is this for?" during the rights waiver process. Defendant contends that his questions indicated that he did not understand the purpose of the *Miranda* waiver form. We disagree. The second exchange to which defendant refers clarifies the meaning of defendant's phrase:

"[HEIDENREICH]: Anything you say can be used against you in a court of law; do you understand that?

[DEFENDANT]: What is this for?

[HEIDENREICH]: I have to read you these. Once we're all done with this I'll explain it. If you don't want to talk to me then, you don't have to talk to me.

[DEFENDANT]: I mean I want to talk. I'm saying I don't know what you talking about."

In context, defendant's question appears to be directed at the purpose of the interview in general; his statement that he did not know what police were "talking about" reads as a declaration of innocence (or a denial of knowledge about the shooting), not a statement that he did not understand the rights waiver. (We further note that defendant's answer that he "want[ed] to talk" indicates both that he understood the admonition that he could not be compelled to talk to police and that he affirmatively wished to speak anyway.)

Because we disagree with each of defendant's interpretations of the recording as establishing his lack of understanding of the rights

---

[5]Defendant disputes the accuracy of this quote, but, as discussed in our description of the recording, we have concluded that the quote is correct. We therefore need not discuss the contentions defendant raises based on his version of the quote.

waiver process, we reject his argument that his lack of understanding rendered his waiver unknowing and unintelligent.

■ Defendant's second argument on appeal is that his confession should have been suppressed because he invoked his right to silence during the questioning that followed his initial waiver of his *Miranda* rights. Even if a suspect initially waives his rights and agrees to talk to authorities, "the interrogation must cease if he indicates 'in any manner' prior to or during questioning that he wishes to remain silent." *People v. R.C.*, 108 Ill. 2d 349, 353 (1985), quoting *Miranda*, 384 U.S. at 444-45, 16 L. Ed. 2d at 707, 86 S. Ct. at 1612. However, in order to invoke the right to silence, a suspect must make some "positive assertion" indicating that he wants to remain silent. *People v. Patterson*, 217 Ill. 2d 407, 445 (2005).

In arguing that he invoked his right to silence during the interview, defendant points to three instances in which he said, "I can't talk." (Defendant concedes that a fourth instance, in which he said, "I can't even talk the way my throat hurt," was not an invocation of his right to remain silent.) Looking at the statements in isolation, we might agree with defendant that his statements conveyed the idea that he wanted to invoke his right to silence. However, when we consider the contexts of the statements, as well as defendant's mannerisms when he made the statements, we reach a different interpretation. In the first of the instances to which defendant refers, he was apparently on the cusp of confessing and cut off Lindberg to say, "All right, look; all right, man, okay," but then seemed to lose his nerve before lowering his head and saying "I can't talk, man." Defendant's use of the phrase "I can't talk" in this context does not leave the impression that he wished to stop the interview but rather that he was hesitant to confess. The second and third instances to which defendant refers occurred when the detectives were pressing defendant to tell the truth—he used the phrase again in a manner that leaves the impression that he was hesitant to admit his involvement in the shooting, but not opposed to continued conversation with police. Because we disagree with defendant that he indicated his desire to stop speaking with police, we reject his argument that his confession was inadmissible because it followed his invocation of his right to silence.

■ Defendant's third argument on appeal is that the police interrogation was so unduly coercive that it rendered his confession involuntary and thus inadmissible as a violation of his rights under the fifth and fourteenth amendments to the United States Constitution (U.S. Const., amends. V, XIV) and article I, sections 2 and 10, of the Illinois Constitution (Ill. Const. 1970, art. I, §§2, 10). See *People v. Foster*, 168 Ill. 2d 465, 475 (1995). "A defendant's confession will be

considered involuntary only when the defendant's will was overborne at the time of the confession, such that the confession 'cannot be deemed the product of a rational intellect and a free will.' " *Foster*, 168 Ill. 2d at 475-76, quoting *People v. Kincaid*, 87 Ill. 2d 107, 117 (1981). To determine whether a defendant's confession was voluntary, a court must consider the totality of the circumstances surrounding the confession, including the defendant's age, intelligence, education, experience, and physical condition at the time of the interrogation; the presence of *Miranda* warnings; the presence of any physical or mental abuse; and the legality and duration of the detention. *People v. Willis*, 215 Ill. 2d 517, 536 (2005).

In urging that his confession was involuntary, defendant emphasizes that the detectives misled him as to the strength of the evidence against him by insinuating that the shooting had been filmed and that several witnesses had identified him as the person who shot the victim or escaped the scene after the shooting. However, defendant correctly concedes that "police trickery, standing alone, does not invalidate a confession as a matter of law." *Frazier v. Cupp*, 394 U.S. 731, 739, 22 L. Ed. 2d 684, 693, 89 S. Ct. 1420, 1425 (1969) ("The fact that the police misrepresented [the evidence] is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible"); *People v. Kashney*, 111 Ill. 2d 454, 466 (1986) ("A misrepresentation which prompts inculpatory statements is only one factor to be considered in determining the voluntariness of the resulting statements"), citing *People v. Martin*, 102 Ill. 2d 412 (1984). In *Frazier*, *Kashney*, and *Martin*, police or the prosecution falsely exaggerated the evidence against the defendants, and the defendants thereafter confessed their guilt. See *Frazier*, 394 U.S. at 737, 22 L. Ed. 2d at 692, 89 S. Ct. at 1424 (defendant falsely told that his accomplice had confessed); *Kashney*, 111 Ill. 2d at 462 (prosecutor falsely told defendant that his fingerprints were found at the crime scene); *Martin*, 102 Ill. 2d at 418 (defendant falsely told that an accomplice had identified him as " 'the triggerman' "). The courts held the confessions to have been voluntary and admissible.

Defendant recognizes the above line of precedent and instead relies on another case, *People v. Bowman*, 335 Ill. App. 3d 1142 (2002), to support his argument that the police deception here rendered his confession involuntary. In *Bowman*, police enlisted the defendant's cell block mate to convince the defendant, who was "intensely fearful" of being returned to a particular correctional center in which he had spent four years, "that if [the defendant] [confessed], [he] would avoid a transfer to [the correctional center] and stay in the county jail long enough for [the cell block mate] to be released from jail, to return, and

to assist in [the defendant's] escape." *Bowman*, 335 Ill. App. 3d at 1147, 1154. The appellate court affirmed the trial court's judgment that the defendant's confession was involuntary; it concluded that police used deceptive interrogation tactics, calculated to take advantage of the defendant's intense fear of returning to the correctional center, as a means to overcome the defendant's free will. *Bowman*, 335 Ill. App. 3d at 1154.

We see a wide chasm between *Frazier*, *Kashney*, and *Martin* on one hand and *Bowman* on the other. In *Frazier*, *Kashney*, and *Martin*, the deception related to the ability to prove the defendants' involvement in the crimes; in *Bowman*, the police used deception to offer the defendant a provocation to confess extrinsic to the interrogation process. In an appeal of a *habeas corpus* proceeding in an Illinois case, the Seventh Circuit aptly described the difference between these two types of deception:

> "Of the numerous varieties of police trickery ***, a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary. [Citations.] Such misrepresentations, of course, may cause a suspect to confess, but causation alone does not constitute coercion; if it did, all confessions following interrogations would be involuntary because 'it can almost always be said that the interrogation caused the confession.' [Citation.] Thus, the issue is not causation, but the degree of improper coercion ***. Inflating evidence of [the defendant's] guilt interfered little, if at all with his 'free and deliberate choice' of whether to confess [citation], for it did not lead him to consider anything beyond his own beliefs regarding his actual guilt or innocence, his moral sense of right and wrong, and his judgment regarding the likelihood that the police had garnered enough valid evidence linking him to the crime. In other words, the deception did not interject the type of extrinsic considerations that would overcome [the defendant's] will by distorting an otherwise rational choice of whether to confess or remain silent." *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992).

We agree with the Seventh Circuit and conclude that the police deception here had little, if any, undue coercive effect.

Aside from the police deception regarding the evidence against defendant, defendant also takes issue with the detectives' downplaying his level of culpability by contrasting his alleged actions with those that are typically associated with murder and by rationalizing his alleged actions as defense of a friend. Defendant argues that the detectives misrepresented his position to him and implied that his confession would have less serious consequences than the minimum 45-year prison sentence he actually faced. We disagree with defendant's

interpretation. The detectives did, as defendant notes, consistently contrast defendant's alleged actions with more serious crimes, and they did offer that his actions were understandable. However, their comments were limited to moral rationalizations for defendant's alleged acts—they made no comment on the legal implications of the shooting.

Defendant also urges that, by downplaying his culpability, offering that his being remorseful and honest would "look[ ] good" and give him "a good chance of getting by," noting that his failure to be forthright might make him the type of defendant a judge would want to "hammer," telling him that "the only way [it was] going to go away [was] [his] talking," and twice telling him that "[t]he truth [would] set [him] free," the detectives contradicted the *Miranda* warning that anything he told police could be used against him in court. Again, we disagree with defendant's interpretations. The full context of the remarks that "[t]he truth [would] set [defendant] free" and that "the only way [it was] going to go away [was] [his] talking" demonstrates that the detectives were referring not to the legal consequences of defendant's alleged actions, but rather to the sense of guilt defendant was feeling for his involvement in the shooting. In fact, the second time Lindberg told defendant that the truth would set him free, he qualified the statement in just that manner, by telling defendant, "the truth will set you free meaning that you won't have that burden anymore in your heart." The remainder of the comments defendant highlights were extensions of the detectives' argument to defendant that honesty would make him look better and that his continued failure to tell the truth would reflect poorly on him.

Defendant's remaining quarrels with the interview are that he was interrogated in a small room controlled by police, that the detectives displayed confidence in their knowledge of his guilt, that the detectives denied his requests to call his mother, and that he was only 17 years old at the time of his confession. However, as the State observes, defendant had waived his *Miranda* rights, was given breaks and water when he requested them, was literate and appeared to understand the police questioning, had past experience with police, was not handcuffed or restrained, and at no time appeared "excessively nervous or frightened." The State also notes that the interrogation lasted for approximately 1½ hours before defendant confessed, that defendant appeared to be in no physical discomfort, and that defendant never complained of any mistreatment. In light of the totality of these circumstances, even considering any coercive effect of the detectives' deceptive tactics, we conclude that the interrogation was not so unduly coercive that defendant's confession was not a product

of his own free will. We therefore reject his contention that the confession was involuntary and inadmissible.

■ Defendant's final argument is that his 60-year sentence was excessive. Defendant was convicted of first-degree murder, a conviction that normally carries a sentencing range of 20 to 60 years. 730 ILCS 5/5—8—1(a)(1)(a) (West 2006). However, because defendant used a firearm in committing the murder, subsection 5—8—1(a)(1)(d)(iii) of the Unified Code of Corrections (Code) (730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2006)) mandated that the trial court add a minimum of 25 years to his sentence. To the extent defendant challenges the trial court's application of discretion in weighing the appropriate factors and arriving at a sentence, we cannot reverse the trial court's decision absent a showing that the trial court abused its discretion. *People v. Streit*, 142 Ill. 2d 13, 19 (1991). To the extent defendant's sentencing contentions present questions of law, our review is *de novo*. See *People v. McClure*, 218 Ill. 2d 375, 381 (2006) (questions of law are reviewed *de novo*).

Defendant first challenges his sentence on the basis that it is disproportionate to the nature of his offense, because "[t]he events that led to the shooting abounded with coincidence and terrible luck." Defendant then recites a litany of events that "happened" to occur prior to the shooting; among those are that he "happened to be carrying a [loaded gun]" and that his shooting the victim "happened to cause a fatal injury." These two events are, of course, more than mere happenstance—they are choices defendant made. The remainder of the "coincidences" to which defendant refers—such as his companion's happening to break his lighter, his companion's happening to see a lighter in the victim's car, and the victim's happening to see the companion in the car—amount to no more than a list of the events that set the scene for the shooting. Defendant thus frames the shooting as the inextricable product of these uncontrollable "coincidences," not an act he himself brought about. Instead of venturing into the philosophical waters into which defendant would draw us, we think it sufficient to say that defendant takes a deterministic view of human nature not shared by the law. Defendant was sentenced based on his choices, including his choice to shoot the victim.

Defendant also asserts that the trial court failed to give due consideration to the fact that the shooting was not premeditated but was rather a sudden reaction to the unanticipated struggle between his acquaintance and the victim. However, the trial court addressed this assertion when it announced defendant's sentence. The trial court stated that the shooting was "spur of the moment," but it added that "[defendant's] decisions amounted to the decision to discharge that

gun rather than to run away or use some other means to assist [his] friend." Thus, the trial court acknowledged the spontaneous nature of the shooting but emphasized that defendant had ample time to choose a less violent course. We see no abuse of discretion in the trial court's assessment.

Defendant next asserts that the trial court improperly used aggravating factors—the facts that defendant was responsible for the presence and use of the gun at the crime scene—that were inherent in his receiving a sentencing add-on under subsection 5—8—1(a)(1)(d)(iii) of the Code (730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2006)). Defendant is correct that our supreme court has stated that a factor necessarily implicit in a crime should not be used as an aggravating factor in sentencing. See *People v. Conover*, 84 Ill. 2d 400, 402-04 (1981). However, we do not interpret the trial court's sentencing ruling as relying on defendant's using a gun as an aggravating factor. While the trial court observed that defendant purchased the gun prior to the shooting and used it during the shooting, it prefaced the observation by stating that it was "not considering any factors that [were] implicit in this offense, but [it was] considering the nature and circumstances of how this offense was committed." The observation about defendant's owning and using the gun then followed as part of the trial court's summary of the nature of the shooting, not as an articulation of a separate aggravating factor. A trial court's considering the nature and circumstances of the offense does not violate the rule from *Conover*. See *People v. Wyatt*, 186 Ill. App. 3d 772, 779-80 (1989).

Defendant next takes issue with the trial court's assessment of his character. Defendant asserts that his criminal history was not sufficiently serious to warrant his sentence, and he notes that a lack of criminal history could actually be a valid reason for reducing his sentence. However, even if defendant's history of juvenile delinquency could not be characterized as extensive, it was still sufficiently serious to be considered an aggravating factor in his sentencing. Defendant also contends that the trial court "took [him] to task for his alleged choice to focus on gang affiliation, illegal drugs and criminal activity, rather than education" but "totally overlooked" the portion of defendant's juvenile probation discharge summary (contained in the presentence report) indicating that defendant had made progress in those areas. To the contrary, we think it is defendant who has overlooked a portion of the presentence report. While a portion of his juvenile discharge summary indicated his desire to break gang ties and his progress with drug treatment programs, the portion of the presentence report summarizing defendant's personal history revealed that he had failed drug tests during his probation and that he indicated

both that he had used drugs possibly up until his arrest and that he was a member of a street gang. We find no fault in the trial court's assessment of defendant's character.

Finally, defendant contends that the trial court's "most egregious" sentencing error was its failure to give adequate weight to his young age as a factor in mitigation. However, as defendant himself observes in his brief, the trial court explicitly recognized that defendant's age could be considered a factor in mitigation. Thus, the record indicates that the trial court considered defendant's age as a potential mitigating factor. We will not on appeal revisit the trial court's judgment of the relative weight of that factor. See *Streit*, 142 Ill. 2d at 19 ("A reviewing court must not substitute its judgment for that of a sentencing court merely because it would have weighed the factors differently").

For the foregoing reasons, we affirm the judgment of the circuit court of Winnebago County.

Affirmed.

BOWMAN, J., concurs.

JUSTICE BURKE, specially concurring:

I concur in affirming defendant's conviction and sentence. I write separately to comment on the majority's statement of the applicable standard of review regarding the motion to suppress defendant's statements. After substantial discussion, the majority, citing *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446 (2009), ultimately concludes that the trial court's factual findings are subject to *de novo* review because defendant's interrogation was videotaped, the trial court viewed the videotape during the hearing, and the same videotape was available for appellate review. In *Addison*, testimony was submitted by admitting discovery depositions into evidence. The court held that a deferential standard of review was not warranted, because the trial court heard no live testimony and based its factual determinations on the exact record that was presented to the reviewing court. *Addison*, 232 Ill. 2d at 453.

As the majority notes, the trial court in the present case reviewed the videotape. However, unlike in *Addison*, the trial court also heard testimony from several witnesses concerning the interrogation depicted on the tape, as well as evidence of the occurrences that took place before and after that interrogation. The trial court was free to base its factual findings on the totality of the evidence presented. And, as always, this court is free to review the tape and determine that the

trial court's factual findings are against the manifest weight of the evidence.

In *People v. Calhoun*, 382 Ill. App. 3d 1140, 1145 (2008), the trial court found that the State had failed to prove that the defendant affirmatively acknowledged that he understood his *Miranda* warnings. During the hearing on the motion to suppress the defendant's statements, the trial court heard the testimony of the detectives who interviewed the defendant, and it indicated that it also viewed the DVD recording of the defendant's interview sometime before the hearing. On review, the appellate court viewed the same DVD as the trial court and applied a deferential standard of review to determine whether the trial court's finding that there was no indication that the defendant understood his *Miranda* warnings was against the manifest weight of the evidence. *Calhoun*, 382 Ill. App. 3d at 1145. The present case is factually similar to *Calhoun*, and I would apply the same standard of review. When a trial court bases its factual determinations on both substantive testimony and documentary evidence, a deferential standard of review is appropriate. See *Comedy Cottage, Inc. v. Berk*, 145 Ill. App. 3d 355, 359 (1986) (*de novo* review inappropriate where the trial court not only reviewed transcripts but also heard testimony by the parties prior to making its findings).